HENRY WOOD, Trustee, Appellant, v. KANSAS CITY HOME TELEPHONE COMPANY, ED. L. BARBER, JAMES S. BRAILEY, JR., and O. C. SNIDER.

Division One, November 27, 1909.

1. **SPECIFIC PERFORMANCE: Corporate Stock: Equity.** Where the corporation is in its infancy, its stock not listed on the market, and is held in a pooling trust so that it cannot well be purchased, equity will specifically enforce a contract to transfer said stock, and will not remit the purchaser to his action at law.

2. ———: **Equity: Clean Hands.** In a suit to enforce a contract, the rule of equity that they who come into a court of equity must come with clean hands, applies usually only to the manner of obtaining the contract, and not to conduct subsequent to entering into a valid agreement.

3. ———: **Duress: Threat to Breach Contract.** A contract made by way of compromise may be impeached by a showing of duress; but to establish duress the evidence must show facts reasonably adequate to overcome the will of the party making the compromise. To refuse performance of an existing contract unless the party will yield to the compromise, is not duress.

4. ———: ———: **Lawsuit.** A threatened lawsuit, civil in character, is not duress, and will not avoid a contract entered into to avoid such suit.

5. ———: ———: **Acceptance of Beneficial Parts.** A party who accepts that part of a contract which is beneficial to himself, or has recognized the validity of other portions thereof, cannot avoid its enforcement by pleading duress.

6. ———: ———: **In Statu Quo.** To avoid a contract for duress the objector must place the parties *in statu quo*, either by tender beforehand or in the bill in equity.

7. ———: ———: ———: **As a Whole.** A contract induced by duress is ordinarily voidable, not void, and the party wishing to avoid it must avoid it as a whole. He cannot ratify the part beneficial to him, and repudiate the objectionable part.

8. ———: ———: ———: ———: **Compared** ▮▮▮▮ **Deceit.** There is a difference between an action for fraud and deceit, and an action to avoid a contract for duress. In fraud

and deceit the party ratifies the contract as made, but says that he has been damaged because the thing delivered is not as was represented; to cancel a contract for duress, it must of necessity be repudiated, and it is a preliminary necessity to its cancellation that the parties be placed *in statu quo*.

9. ————: ————: **Timely Revocation: Laches.** A person seeking an avoidance of a contract for duress must proceed within a reasonable time after the removal of the duress. For an adult man, in full possession of his will power and experienced in the line of business, to wait for two years after the duress was removed to repudiate the contract entered into through the duress, is to be guilty of laches.

10. ————: ————: **Compromise: Fear of Loss.** Compromise agreements in view of threatened litigation are favorites of the law. And when defendants only claim that it was a fear of loss in their project to construct a telephone system that compelled them to sign a compromise agreement with the promoter and plaintiffs who had an interest in the franchises, they plead no legal defense to the enforcement of said agreement.

11. ————: **Consideration.** A valid compromise furnishes a sufficient consideration for a contract.

Appeal from Jackson Circuit Court.—*Hon. John G. Park,* Judge.

REVERSED AND REMANDED (*with directions*).

*C. B. Stark* and *Elijah Robinson* for appellant.

(1) Plaintiff and his associates had a perfect right to buy the franchise from Enoch, regardless of whether they had notice of the contract that Enoch had made with the Central Construction Company. Land & Gravel Co. v. Com. Co., 138 Mo. 439; Chambers v. Baldwin, 91 Ky. 121; Bourlier v. Macauley, 91 Ky. 135; Boison v. Thorn, 98 Cal. 578; McCann v. Wolff, 28 Mo. App. 447; Cooley on Torts, 497. (2) The compromise of the controversy between the People's Telephone Company and the Home Telephone Company constituted a sufficient consideration for the contract herein sued on. Reilly v. Chouquette, 18 Mo. 220; ———— v. Dugan, 20 Mo. 102; Hill v. Coal Co., 124 Mo. 153; Silliman v. U. S., 101 U. S. 465. (3) The

contract sued on was not procured by duress. Morgan v. Joy, 121 Mo. 677; Wolfe v. Marshall, 52 Mo. 167; Dausch v. Crane, 109 Mo. 323; Sullivan v. U. S., 101 U. S. 465. (4) The circuit court had jurisdiction to decree the specific performance of the contract sued on. State ex rel. v. Smith, 104 Mo. 419; State ex rel. v. Ellins, 130 Mo. 90; Burke v. Kansas City, 118 Mo. 309; Leonard v. Sparks, 117 Mo. 103; Musick v. Company, 114 Mo. 309; State ex rel. v. Neville, 110 Mo. 345; State ex rel. v. Withrow, 108 Mo. 1; Pope v. Blair, 105 Mo. 85. (5) Under the evidence in this case the court should have decreed specific performance of the contract sued on. Waterman on Specific Performance, secs. 16 and 19; Pomeroy on Contracts, secs. 15, 17 and 19; Fry on Specific Performance, 1469.

*A. F. Broomhall* and *Ward, Hadley & Neel* for respondents.

Rights not yet acquired may be assigned. The contract of September 28, 1901, between Barber and Enoch constituted a complete assignment of the telephone franchise to the Kansas City Home Telephone Company. Enoch having acquired the property, Barber and the Telephone Company having advanced the consideration on the faith of the assignment their rights became vested and could not be impaired by any act of Enoch's. Pomeroy's Eq. Jur., secs. 369, 373; Warren v. Bank, 25 L. R. A. 746; Johnson v. Bryson, 27 Mo. App. 341; Schubert v. Herzberg, 65 Mo. App. 578. A vendor of personal property cannot confer a better title than he has. The Peoples Telephone Company stood in Enoch's shoes and as he had no rights it had none. Anson on Contracts, sec. 302; Owens v. Evans, 134 N. Y. 514; Kerohan v. Durham, 48 O. S. 1; Smith v. Sterritt, 24 Mo. 260. If the claim, the waiver of which is relied upon as a consideration, cannot be entertained in good faith a compromise based upon

such a waiver lacks consideration and is void. Restoring to an injured party his chattels of which he has been wrongfully dispossessed is not a good consideration to support a promise to pay money to the wrongdoer. Morgan v. Hodges, 15 L. R. A. 438 (note); Keeler v. Neel & Watts (Pa.), 424, C. Y. C., vol. 8, page 509; Morey v. Newfane, 8 Barb. 645; Sullivan v. Collins, 18 Iowa 228; Crosby v. Wood, 6 N. Y. 369; Swaggard v. Hancock, 25 Mo. App. 596; Livingston v. Dugan, 20 Mo. 103; Long v. Towl, 42 Mo. 550; School v. Matherly, 90 Mo. App. 403. "Where goods or other property is in possession of one not the owner, who refuses to deliver such property to the owner unless the latter pays him a sum not rightfully due, and the owner in order to obtain possession of his property pays the unlawful exaction, a payment so made is in a legal sense under duress, and may be recovered back in a proper action; and especially is such the case where the wrongful detention is connected with circumstances of hardship or serious inconvenience to the owner." Bank v. Sargent, 59 L. R. A. 296 (note); Construction Co. v. Hayes, 191 Mo. 248; Wells v. Adams, 88 Mo. App. 215; Taudy v. Commission Co., 113 Mo. App. 490; Milkeeson v. Hood, 65 Mo. App. 491; Rowland v. Watson, 88 Pac. Rep. (Cal.) 495. To obtain a prior right a secondary assignee of a contract must show that he is an innocent purchaser for value, without notice of facts which would charge his conscience or put him on inquiry; neglect to make inquiry is sometimes equivalent to notice. If he is not an innocent purchaser he can not in good faith claim to be the owner. Pomeroy's Eq. Jur., 599-603-1047-1048; Pomeroy's Eq. Jur., 660-670; McLoran v. Monroe, 30 Mo. 462; Sensenderfer v. Kemp, 83 Mo. 581; Bailey v. Winn, 101 Mo. 649; Widecomb v. Childers, 47 Mo. 382; Handy v. Rice, 98 Me. 504; White v. Moores, 86 Me. 62; Waddington v. Lane, 202 Mo. 387; Ellis v. Homan, 90 N. Y. 473. An accord without satisfaction

is void. Brown v. Spafford, 95 U. S. 484; Hearn v. Keel, 81 Am. Dec. 472 (notes); Beach on Contracts, p. 525; Frost v. Johnson, 8 Ohio 393. The contract between Enoch and Barber was a partnership contract. The sale of the property of the partnership by one partner necessary to carry on the business is void. Bates on Partnership, sec. 403; Coughton v. Forrest, 17 Mo. 131.

GRAVES, J.—For some months prior to November 9, 1901, one John Enoch had been diligently engaged in trying to procure a franchise from Kansas City to construct and maintain a telephone system in said city. From the evidence it appears that the city had previously granted a franchise to what it thought was an independent concern, but nothing came from it, and the old telephone company continued to hold the field undisputed as to competition. It would appear that the purpose of the then Mayor was to secure competition in the telephone business in the city, and if possible to obviate what had been denominated "sell outs" in franchises granted. The Mayor had conceived the idea of requiring a deposit to be made by applicants for franchises, which deposit was to his mind the best evidence of good faith, and which deposit as he thought would tend to compel the applicant to accept the terms of the ordinance granting the franchise, and thus compel the building of a new telephone system in the city. It appears that Enoch had put up a guarantee of $1,000 and had succeeded in getting his ordinance through the lower branch of the Common. Council. At this point the Mayor took a hand. Recalling past experiences and fearing that another "sell out" was apparent, he interested himself in opposition to the ordinance, and frankly told Enoch and his representatives his reasons therefor, which were as above indicated. The Mayor had the matter blocked in the

upper house of the Common Council. Enoch, who lived at St. Charles, Missouri, was introduced to Charles B. Stark by a mutual acquaintance, Mr. Player, then a prominent official of the city of St. Louis. This was sometime prior to September 15, 1901. Enoch was trying to get parties interested so that he could get his franchise through the Common Council, and build the plant. Stark was a personal friend of the Mayor of Kansas City, and had a clientage in St. Louis among men of means, who could furnish the money with which to finance the deal. Stark went to Kansas City and had a talk with the Mayor and further proceeded to get together a syndicate of St. Louis capitalists to handle the proposition. Enoch frequently met Stark in St. Louis, and the result of it all was an agreement to organize a corporation to take over the franchise granted to Enoch. Mr. Stark and his associates incorporated the Peoples Telephone Company. At the suggestion of Enoch, Stark and his friends had first drawn up articles of association in the name of the Home Telephone Company, but when on December 24, 1901, he visited Jefferson City to obtain a charter, from the Secretary of State, it was found that a company under that name had been chartered and that Enoch was one of the incorporators. On December 21, Enoch had, by written assignment duly acknowledged, assigned his interest in the franchise to the Peoples Telephone Company. When Stark found the name Home Telephone Company already appropriated, he took out his charter by changing to the new name in the Secretary of State's office and further had the assignment of the franchise again re-executed by Enoch. Under this assignment Stark and his friends in St. Louis claimed title to the franchise which had been granted to Enoch. There was also an agreement between Enoch and Stark, as trustee for the syndicate of the same date, December 21, 1901. This agreement covered the details of the organization of the corporation.

Now going back to where we left off in the history of the ordinance. As stated the Mayor had blocked the passage of the ordinance. Early in November or on November 4th, the work of the Mayor brought fruition. Enoch got the Central Construction Company, a co-partnership composed of Ed. L. Barber, James S. Brailey and O. C. Snider, to put up a guaranty fund of $20,000 in order to secure the passage of said ordinance in the upper house of the Common Council. This money at the Mayor's suggestion was placed in the hands of three prominent citizens of Kansas City, who took and received it under written conditions signed by them thus:

"Received the 4th day of November, 1901, from John Enoch, the sum of twenty thousand dollars, upon the following terms and conditions, to wit:

"Whereas, there is now pending before the upper house of the Common Council of Kansas City, Missouri, an ordinance entitled, 'An ordinance granting for a term of thirty years to John Enoch his successors and assigns, the right, privilege and authority to construct, lay and maintain and operate in Kansas City, Missouri, and through the public streets, avenues, alleys and thoroughfares thereof, underground conduits, poles, wires and other appliances for the purpose of furnishing and supplying to Kansas City and the inhabitants thereof a telephone system.' Which said ordinance passed the lower house of the Common Council of Kansas City, Missouri, September 3, 1901.

"1. Now, if said ordinance shall not become a law within thirty days from the date hereof, then said $20,000 is to be returned to the said John Enoch, his order or assigns, upon the said John Enoch, or his assigns, duly delivering to the undersigned, for and on behalf of Kansas City, Missouri, a written relinquishment of all rights which they may have under and by virtue of said ordinance.

"2.  If said ordinance shall become a law within said fifteen days, said John Enoch, his successors or assigns, shall at once employ and place in Kansas City, Missouri, at least ten solicitors, who shall devote their entire time and efforts to securing subscribers for telephone service at the prices and under the terms of said ordinance, except that a contract for telephone service for three years shall be counted, and the said John Enoch his successors and assigns, agree to use all reasonable and possible endeavors to secure within sixty days at least three thousand subscribers for telephone service, and if they shall fail, neglect or refuse to employ the solicitors aforesaid and make the efforts aforesaid in good faith, then said $20,000 shall be paid to Kansas City, Missouri, but if they shall comply with the conditions aforesaid, and shall fail, after earnest effort and consistent effort during the sixty days aforesaid, to secure said 3,000 subscribers, then said $20,000 shall be returned to the said John Enoch, his order or assigns by the undersigned, upon the delivery to the undersigned, for· the use and benefit of Kansas City, of an assignment of all rights, privileges and benefits specified in said ordinance, and the decision of the undersigned, upon the question as to whether or not the said John Enoch, his successor or assigns, have faithfully complied with the conditions aforesaid, shall be final, binding and conclusive, and they are authorized absolutely to dispose of said moneys in the manner above specified.

"It is further provided that the undersigned, or any other persons acting for or in their behalf, shall have the right to solicit and procure subscribers, without expense, however, to the said John Enoch, and such subscribers obtained by or through the undersigned, if reasonably responsible, shall be counted as a part of said 3,000 subscribers.

"3.  If said ordinance becomes a law within sixty days from the date hereof, and the said Enoch, or his

assigns, shall deposit $40,000 in bonds as provided in said ordinance, then said $20,000 shall be returned to said Enoch, his order, assigns, successor or successors.

"4. But if said ordinance shall become a law, and the said Enoch, his assign or assigns, shall in the opinion of the undersigned fail and neglect to make all such possible and reasonable efforts as may be necessary to procure contracts as aforesaid, or after procuring 3,000 or more *bona fide* contracts as aforesaid, shall fail or refuse to deposit the $40,000 in bonds within the time and in the manner provided in said ordinance, then the $20,000 this day received, is to be paid into the treasury of Kansas City, to become at once without further transfer, assignment or act, the property of said city, free from all claims and demands whatsoever of said John Enoch, his order, assigns or successors or any other person, and in the meantime the undersigned are hereby authorized to deposit said funds in the Union National Bank of Kansas City, Missouri, and if so deposited they shall not be held responsible by the said John Enoch, his assigns or successors for any failure on the part of said bank.

"5. In the event of the death, sickness, absence from the city, resignation, or inability to act of any one of said trustees, then the two remaining trustees are hereby authorized to appoint the successors in trust for said trustee.

"Executed in triplicate, this 4th day of November, 1901.

"F. M. BLACK,
O. H. DEAN,
C. O. TICHENOR."

Whilst the written instrument indicates that Enoch put up the cash, the evidence shows that it was in fact put up by the Construction Company, a partnership which was engaged in constructing telephone

223 Sup—35

plants. On the same day, November 4th, the Mayor by communication recommended the passage of the ordinance and it was passed by the upper house on that day and on November 9th signed by the Mayor.

Prior to this on September 28th, Enoch had entered into a written contract with Ed. L. Barber and the Central Construction Company, by the terms of which it was agreed that Barber should organize a corporation to handle the franchise, Enoch should assign the franchise, the Construction Company should be employed to build the plant, Enoch was to endeavor to purchase the $40,000 bonds required to be deposited under the ordinance, Barber to furnish security that such bonds should be returned in two years, and Enoch was to be employed by the Construction Company at proper compensation. Enoch was to receive $15,000 in bonds and $25,000 in stock of the corporation.

The defendants claimed title under this contract to assign and an assignment made later under a compromise agreement which will be more fully outlined.

By the plaintiff it is claimed that they had no knowledge of this agreement of September 28th, but that Enoch had informed them that Ed. L. Barber had materially assisted him in procuring the franchise. Unfortunately Enoch was dead at the date of the trial. Stark claims that with this information to the effect that Barber had been of material assistance in procuring the franchise, he on the date of its assignment to his corporation, i. e., December 21, 1901, wrote to Barber offering to take him in the syndicate on the same footing as the other members thereof. This Barber declined, stating that he had already acquired a contract to convey the franchise. Much letter writing was indulged in by all parties during the interim between November 9th and January 4th, following. Barber and his associates had undertaken to get subscribers as per the conditions of the deposit of $20,000. Thus matters stood until January 4, 1902, when the

Mayor of Kansas City, evidently disgusted with the situation, and fearing a failure under the ordinance to procure a competitive telephone system in the city, telephoned Stark and his associates to come to Kansas City on January 4th. On that date the Mayor got Stark and Crouch, representing the St. Louis syndicate, Barber and his associates, Enoch, and also Mr. Dean, the Mayor's friend and adviser, in his office in that city. Having all sides safely housed in his office, he locked the door and told all parties how the city had suffered from ''sell outs'' in the granting of franchises ,and also of his pledge to the citizens that he would procure competition in telephone service, and that it appeared, as between warring parties, the prospects of such under this ordinance was doubtful. He told them that if some agreement in settlement was not made, he would call the council together and see if the ordinance could not be repealed. His remarks were addressed to one side as well as the other. The result of a full day's discussion behind locked doors was a contract of settlement, which contract, however, was made subject to the approval of the board of directors of .the Peoples Telephone Company. To this agreement both corporations and Enoch were parties. By its terms Enoch agreed to assign his franchise to the Home Telephone Company, agreed to give the Peoples Telephone Company the sole right to connect toll lines from surrounding cities and towns with its Kansas City exchange. Enoch was also to assign his stock in the Home Telephone Company to E. L. Barber, and was to receive from the Home Telephone Company, $5,000. The Peoples Telephone Company was to assign all its rights under the Enoch ordinance to the Home Telephone Company. Other details are immaterial, as it was understood that the agreement should be first submitted to the directors of the Peoples Telephone Company for their approval, which was done, and the approval thereof was withheld or not given.

So thus ended the contract which had its birth in the Mayor's office. The Home Telephone Company, however, was making every endeavor to have it ratified by the other company. Representatives visited St. Louis to get some understanding on the contract. Finally the parties met at the Baltimore Hotel in Kansas City on January 30, 1902, and after spending much time finally agreed upon an adjustment of the conflicting claims. Stark's people were not satisfied with the toll line agreement made in the Mayor's office and thought they were entitled to more than a toll line agreement before they should assign their claimed interests in the Enoch franchise ordinance. Stark had brought to the conference beginning on January 30, 1902, at the Baltimore Hotel in Kansas City, a draft of what the St. Louis people wanted by way of contracts in settlement of the dispute. The conference finally closed on the morning of January 31st. The copies of contracts brought by Stark were changed in some ways, and Mr. Barber had prepared and put in shape at his own office and by his own stenographer the two contracts finally agreed upon as a settlement of the matter. One was an elaborate traffic agreement as to the toll lines which the Peoples Company was to build, and the other was the contract in this suit. Later the Home Telephone Company took an option to purchase this traffic contract at $10,000 and paid $500 for the option. They also paid $500 for an extension of the option and finally after sending their counsel to St. Louis, to inform the Peoples Telephone Company that their traffic contract was bad as being in restraint of trade, they paid the $10,000, and took over the contract, at an expense of $11,000 in all, so far as the amount expended should be measured by the amount received by the Peoples Telephone Company.

The contract involved in this suit reads:

"Kansas City, Mo., Jan. 31, 1902.

We, the undersigned, hereby agree that in consideration of the Peoples Telephone Company of Kansas City, Missouri, assigning all their rights, title and interest in the franchise granted by the Common Council of Kansas City, Missouri, to John Enoch, granting him the right to construct a telephone exchange plant in the city of Kansas City, Missouri, under Ordinance Number 18477 to the Kansas City Home Telephone Company, we will deliver to Henry Wood, trustee, four hundred shares of the par value of one hundred dollars per share of the capital stock of the Kansas City Home Telephone Company, said stock to be the most favored or preferred stock of said company and to be full paid and non-assessable and to be delivered to the said Henry Wood, trustee, as soon as stock of the said Kansas City Home Telephone Company to that amount shall be issued to or for the benefit of the said Central Construction Company or the said Barber.

"In Witness Whereof, the Central Construction Company has hereunto set its name by its president and the said Ed. L. Barber has hereunto set his hand.

"Central  Construction Company,
"By Ed. L. Barber,
"Ed. L. Barber.

"Frank E. Wells, Witness."

Plaintiff by his petition seeks to impound 400 shares of the stock of the character mentioned in the contract in the hands of the Home Telephone Company and the specific performance of this contract, making all proper allegations in details not necessary here to state.

The answer is very verbose, but when boiled down pleads (1) a general denial (2) that the contract was procured by duress and (3) that the contract was without consideration and therefore void.

Reply was general denial.

By judgment of the court the plaintiff's bill was dismissed, from which judgment in due form and order the plaintiff has appealed. This sufficiently states the case for a discussion of the points involved, which discussion will necessarily involve further details of the evidence.

I. One question at the threshold of this case is as to the jurisdiction of a court of equity. The learned trial judge filed a written opinion, and concludes it with this remark: "Plaintiff has no standing in a court of equity. His bill will be dismissed, and he will be remitted to his action at law." We take it, however, that these concluding remarks were addressed to the trial court's conclusions to the effect that plaintiff did not come into court with clean hands. The trial court reviewed both the evidence and the law upon the question as to whether or not this was a case for specific performance, and concludes his remarks upon that subject thus:

"Public securities and listed corporate stocks and bonds are always obtainable on the market, and equity will not ordinarily specifically enforce a contract for a conveyance of such property. [3 Pomeroy's Equity Jurisprudence (2 Ed.), sec. 1402.]

"But unlisted corporate securities, or those in the exclusive possession of the defendant, or those of uncertain value, may be the subject of a decree for specific performance. [26 Am. & Eng. Ency. Law (2 Ed.), p. 122; Waterman on Spec. Perf., sec. 17; Treasurer v. Mining Co., 23 Cal. 390; Frue v. Houghton, 6 Colo. 318.]

"The record shows that this case belongs to the latter class and hence equity has jurisdiction, so far as the general nature of the proceeding is concerned."

At the institution of the suit it clearly appears from the evidence that the stock was unlisted on the market, and not only so but that it was held in a pool-

ing trust, so that it could not well be purchased. If purchased the rights of a stockholder under the pool would be limited. Defendants say it was worth 30 to 40 cents on the dollar when the suit was begun and worth 80 cents on the dollar at date of trial, and what it may be worth now, no one knows. A review of the case law is thus summarized in 26 Am. and Eng. Ency. Law (2 Ed.), p. 122:

"23. *Stock in Corporations.*—a. In General.— Whether or not a contract for the sale of corporate stock will be specifically enforced depends upon the adequacy of the remedy at law.

"b. When Contract Enforced.— (1) In General. —Where the corporate stock to which the contract relates is not procurable in the market, and its pecuniary value is not readily ascertainable, specific performance will, as a rule, be decreed, especially where the court acquires jurisdiction of the action on the ground that it is an action to enforce a trust.

"(2) Where Stock of Peculiar Value to Plaintiff.—Where the stock with reference to which the contract is made is of peculiar value to the plaintiff in order that he may obtain a proper and legitimate control over the management of a private corporation, specific performance will, as a rule, be decreed.

"c. When Performance Denied.— (1) In General.—Specific performance of a contract for the purchase or sale of stock will not be decreed where the stock is purchasable on the market or has a money value which may be readily computed. Nor will a contract for the sale of stock be enforced where it involves an attempt improperly to interfere with the rights of other stockholders."

Under this statement of the rule, which is well sustained by the authorities, and under the evidence in the case, we are satisfied that if there are not other reasons for declining specific performance of the contract, a specific performance should have been de-

creed. In other words, the evidence upon this point is sufficient to call for equitable cognizance. It is such as to indicate inadequacy in a legal proceeding for damages. The corporation was in its infancy, and even had the stock not been held in a pooling trust, in a measure, the unfixed market value should be considered. Thus far we concur in the language last quoted from the trial court.

II. The learned trial judge did not pass upon the validity of the contract in suit, either upon the question as to whether or not it was the result of duress, or was without consideration. This occurs to us is the vital question. By intimation it would seem that the trial judge was of the opinion that there was a valid compromise contract, but that the plaintiff should be relegated to an action at law thereon. Such conclusion would be justified by the concluding remarks in the opinion of the court, which opinion appears at length in respondent's brief. But, be this as it may, we are of opinion as indicated in our paragraph one, that the facts shown as to the condition of this stock gave a court of equity the right to enforce specific performance, without there is some reason why the contract should not be enforced. In other words, unless there is something which directly affects the integrity and validity of the contract, we should enforce it. The question of coming into a court of equity with clean hands, is not in the case, save and except the manner in which the contract was obtained, and this goes to the integrity and validity of the contract itself. If the contract is valid, there has been nothing done since its execution, which would invoke the rule, that the parties seeking equity must come to presence of equity with washed hands. The whole matter is relegated to an inquiry as to the contract itself.

Now going to the contract itself, we find that over the signature of all the parties it is stated that it is in

settlement of contended differences.  It must not be
overlooked that it was a tri-party settlement.  Enoch
claimed to have been out some $6,000 or $7,000 in pro-
curing his ordinance.  Certain it is that he had put up
one thousand dollars with the city treasurer of Kan-
sas City.  It also appears that early in September and
before there was an agreement with Barber and his
associates, Enoch had induced Stark to undertake the
organization of a St. Louis syndicate to finance his
scheme.  Stark had, prior to Barber's appearance upon
the scene, assured the Mayor that his contemplated
syndicate could and would finance the enterprise.  It
is evident, however, from the evidence that Stark, the
agent of his syndicate, knew that Barber had helped
Enoch financially in procuring the franchise, prior to
the assignment of the franchise by him to the Stark
syndicate.  It is also quite clear to our mind that Stark
did not know of an agreement to assign or the organi-
zation of the *Home* Telephone Company, prior to the
assignment, because he prepared his articles of associ-
ation in that name, and as he says, at Enoch's direc-
tion.  It is clear from the evidence that Stark and his
associates did not know of the contract of September
28th, at the date they took their assignment.  It is
urged, however, that Enoch did know of it, and inas-
much as he was to be interested in the Stark corpora-
tion, his knowledge was the knowledge of the St. Louis
syndicate.  On the other hand, it might be said that
Enoch knew that he had undertaken to get Stark to
organize a St. Louis syndicate to take up and finance
the franchise, and that Stark was at work upon it at
the time, when Enoch made the contract of September
28th, and inasmuch as Enoch was a partner and co-
operator with Barber and his folks in that contract,
his knowledge upon that question was likewise their
knowledge.  We take it to be clear law that the burden
is upon the defendants to establish the invalidity of the
contract relied upon by the plaintiff.  That is, they

must show that it is without consideration, or that it was the result of duress. It must not be overlooked that the adjustment of differences was a tri-party arrangement. It might be said to be more than that, for the Home Telephone Company was interested. Enoch was personally interested, the Central Construction Company, composed of Barber, Brailey and Snider, was interested, Barber, personally, was interested, and the Peoples Telephone Company was interested. Now, before going to a discussion of the law of duress and failure of consideration, let us again state the situation of all the parties at the date of the meeting at Mayor Reed's office. Under the contract of September 28th, Enoch was to have $15,000 in bonds and $25,-000 in stock of the proposed corporation, to be organized by Barber—thus appears Enoch's interest. The Central Construction Company, composed as aforesaid, was to do the construction work,—thus their interest. Enoch was to have a position with them at proper salary, during construction—thus another interest of Enoch's, at the time of the compromise. Enoch was to endeavor to purchase $40,000 in bonds to put up as a guaranty that the ordinance would be complied with, and Barber was to furnish security that the bonds should be returned in two years. Thus appears a further interest of both Enoch and Barber. No agreement here that Barber or his associates were to furnish the bonds as security, but on the contrary that Enoch should furnish them and Barber guarantee their safe return within two years. The deposit of these bonds by Enoch released the $20,000 deposit made by Barber for the Central Construction Company. With this released, Barber and his associates had invested only what they had put up in procuring subscription contracts for telephone service, estimated in the evidence at $10,000. Enoch had in the project what he had expended in time, labor and money in procuring the franchise, claimed to be $6,000 to $7,000,

but no items are given as to either the claims of Barber or Enoch. In other words, it does not appear clearly just where either Enoch or Barber could have expended the sums claimed, but for purposes of the case, consider them as so expended. After the letter of December 21st, from Stark to Barber, heretofore mentioned, Barber and his associates had been informed by Enoch that he would not co-operate with them further, thus there was left upon their hands a lawsuit to compel the enforcement of the contract of September 28th. It is suggested that Enoch's reason was that they had not treated him fairly, but there is nothing in the record so to show. We have stated the status of the St. Louis syndicate and need not repeat. Now, such was the situation of the parties when Mayor Reed got them all together in his office. The matter then to be adjusted was the difference between the three or more parties hereinabove indicated. It is admitted on all sides that what the Mayor said on January 4th was said to all parties. The St. Louis parties were there with the $40,000, in cash, to comply with the terms of the ordinance. They had already filed their notice of assignment with the city clerk as required by the ordinance. No notice from the Barber syndicate had been filed. If Barber claimed an assignment, he had taken no steps to announce it under the ordinance. That the depositing of this $40,000 would have released the Barber $20,000 deposit, can hardly be questioned. The agreement reached in the Mayor's office need not be mentioned further than to say that it was changed in many particulars in the later agreement, when all the parties were beyond the threatening influences of the Mayor. Whilst we might concede the immediate terrorizing effect of the Mayor's words, yet we are not convinced that such effect would last for a month and seriously influence shrewd business men in making a contract, nor would it induce them to hide their subdued will for two years or more there-

after. It was changed as to Enoch as well as to the others. By the ultimate settlement Enoch had returned to him the $1,000 put up in cash with the city treasurer, and got the sum of $5,000 cash, and left in the Peoples Telephone Company but eliminated from the Home Telephone Company. So that so far as Enoch is concerned, who was one of the parties to the compromise, he received only six thousand dollars, or really only $5,000 for having surrendered under the contract of September 28, $15,000 in bonds and $25,000 in stock. Of course he had left his portion of such benefits as might have accrued to him under his understanding with the other company.

Counsel for respondents urge that their clients were held up for $40,000 of their stock, but omit to suggest that by the same process their clients eliminated old man Enoch from his claim for $40,000 in stocks and bonds for the trivial sum of $5,000, unless it be said that he was to receive further benefits through the Peoples Telephone Company and these benefits they propose to nip in the bud by repudiating the written contract of their own dictation. They overlook the fact that they received the benefit of the difference between $40,000 of their own stocks and bonds and the sum of $5,000. They further overlook the fact that after signing the contract they, according to their own admissions, purposely, upon one excuse or another, delayed the issuance and delivery of the stock, until such time as the mouth of Enoch was closed in death. No explanation of his conduct can be had, save as appears from the instruments in writing. We shall not comment upon the conduct of Mr. Enoch, further than we have thus far done, save and except to say that he evidently misled both of the two syndicates to a certain extent. But certain it is, when it is considered that Enoch only got $5,000 for his $40,000 proposed interest in the Home Telephone Company, the defendants are not much losers by the compromise

measure entered into by them.  Grant it that they have been out $11,000 for the toll line rights, and have to furnish the $40,000 stock in dispute, they haven't sacrificed a great deal by the compromise measure.

Serious indeed have been the charges preferred by counsel for respondents as to the conduct of the St. Louis syndicate, but when the record is read one concludes that as between the Ohio syndicate and the St. Louis syndicate, it was "diamond cut diamond" in the play.  One difference, however, is that the St. Louis syndicate claims to have entered into the compromise proceeding in good faith (whether they did or not we discuss later) whilst the other side claims they only entered into it, under advice of counsel, with the premeditated design of disavowing the contract at the first opportunity which presented itself, after they, to use a slang expression, "were out of the woods."

We shall take up, therefore, the question of duress and failure of consideration, as the only real questions in the case, and of these in order.

III.  That the contract before us is one of three made at the same time, affecting a compromise between the parties heretofore mentioned, is unquestioned. That a contract made by way of compromise may be impeached on the ground of duress we take it to be well settled.

In 8 Cyc., at page 523, it is said:  "Duress if proved is sufficient to relieve a party from the effect of a compromise which is procured by such means. To establish duress, however, the evidence must show facts reasonably adequate to overcome the will of the party making the compromise."

But what is duress?  Some states have statutes giving definitions, but not so in Missouri.  With us we must go to the common law, and such modifications thereof as have been made by the courts, if any such

have been made. By the common law duress was divided into two classes, (1) duress by imprisonment and (2) duress *per minas*. [9 Cyc., p. 444.] Of the latter class are such Missouri cases as Lacks v. Bank, 204 Mo. 455, and Hensinger v. Dyer, 147 Mo. l. c. 226. The class is thus defined by the same authority at page 445: ''Duress *per minas* arises when a person (1) is threatened with loss of life, (2) is threatened with loss of limb, (3) is threatened with mayhem, or (4) is threatened with imprisonment, and only in these cases at common law.''

So too says the Kansas court, McCormick v. Dalton, 53 Kan. l. c. 149: ''It is apparent from the evidence given by Dalton upon the trial that the execution of the written contract was not procured by duress. [Cable v. Foley, 45 Minn. 421; Hackley v. Headley, 45 Mich. 569; Peckham v. Hendren, 76 Ind. 47; Emmons v. Scudder, 115 Mass. 367.] Duress, in its more extensive sense, is that degree of constraint or danger, either actually inflicted or threatened and impending, which is sufficient in severity or in apprehension to overcome the mind and will of a person of ordinary firmness. Text-writers divide the subject into 'duress *per minas*' and 'duress of imprisonment.' [See Anderson v. Anderson, 9 Kan. 112; Helm v. Helm, 11 Kan. 19; Bank v. Croco, 46 Kan. 620.]''

But in modern practice the courts have gone further and this later doctrine is thus stated by the same authority, 9 Cyc., p. 450: ''The modern doctrine holds that there is no legal standard of resistance which a person acted upon must come up to at his peril of being remediless for a wrong done to him, and no general rule as to the sufficiency of facts to produce duress. The question in each case is, Was the person so acted upon by threats of the person claiming the benefit of the contract, for the purposes of obtaining such contract, as to be bereft of the quality of mind essential to the making of a contract, and was the con-

tract thereby obtained? Duress then, according to this class of cases, includes that condition of mind produced by the wrongful conduct of another, rendering a person incompetent to contract with the exercise of his free will power, whether formerly relievable at law on the ground of duress or in equity on the ground of wrongful compulsion.''

As to what will not constitute duress in law the same authority, 9 Cyc., p. 448, says: ''*What is not legal duress.* Duress by mere advice, direction, influence, and persuasion is not recognized in law. Nor can a charge of legal duress be predicated upon a threat to injure one's credit, to withhold payment of a debt, to refuse performance of a contract, or to foreclose or exercise the power of sale on a mortgage; a threat of arrest or arrest on civil process on a legal claim, when such arrest is allowed by law; or a threat of, or the bringing of, a lawsuit or civil process.''

Some modern cases recognize the doctrine of threats to destroy property or duress of goods under oppressive circumstances, but whatever be the kind of alleged duress the test of the mental condition is as above stated.

One of the things in this compromise contract was the fact that Enoch was refusing to carry out his contract of September 28th. ''To refuse performance of a contract'' is not duress.

In Tucker v. State ex rel., 72 Ind. l. c. 245, the court says: ''As to the claim of the appellants Thompson and Harris, that the bond was executed under duress, it may be said that threats to withhold the payment of a debt, or to refuse the performance of a contract, or to do an injury which may at once be redressed by legal process, are not duress. [6 Wait's Actions and Defences, p. 658.]''

In the McCormick case, supra, Dalton claimed to have an oral contract with McCormick to construct a mile of railroad grade. That after he began to work

he was presented with a written agreement for only one-half mile of the more expensive work at the same price, and upon his refusal to sign it, McCormick told Dalton's men that he would not further stand for their pay and he, Dalton, could stop work. That Dalton was unable financially to carry on the work unless Mc-Cormick paid the men. That under this pressure of losing his contemplated profits, his work already done, and his inability financially to carry on the work he signed the contract. It was held by Horton, C. J., that the contract was not procured by duress.

And Gilfillan, C. J., in Cable v. Foley, 45 Minn. l. c. 422, says: "That the execution of the contracts was procured by duress would not be established by the evidence offered for that purpose. It amounted to no more than that, plaintiff being without means to pay his men, the defendants refused to pay him what was then due him, unless he executed the contract. The mere threat to withhold from a party a legal right, which he has an adequate remedy to enforce, is not, in the eye of the law, duress; certainly not such as will avoid the execution of a contract. [Hackley v. Headley, 45 Mich. 569; Miller v. Miller, 68 Pa. St. 486.]"

The Michigan case cited by the Minnesota court is in full accord, and the opinion therein is by the distinguished Justice Cooley. [Goebel v. Linn, 47 Mich. 489; Miller v. Miller, 68 Pa. St. 486; Domenico v. Alaska Packers' Assn., 112 Fed. 554.]

Another of the things charged as to the final contract is that the St. Louis syndicate threatened to put up the $40,000 bonds, and urged that they were prepared to put them up and that thus defendants were forced to settle or have a lawsuit. A threatened lawsuit, civil in character, is not sufficient. "Threats of legal process is not duress, for the party may plead and make proof and show that he is not liable." [Claflin v. McDonough, 33 Mo. l. c. 416.]

In Morgan v. Joy, 121 Mo. l. c. 683, this court in

discussing a plea of duress has used some language which is applicable here. BLACK, J., there said: "Now, there is no evidence of threats of personal violence, nor was there any confidential relation existing between the plaintiff and the defendants. The whole claim that defendants signed the agreement because compelled to do so, has no other foundation, in fact, than this, that they signed it because they believed it the best way to secure the $5,000 which they had put into the property. The proof is clear that they signed the agreement with full knowledge of all the facts, and that the agreement was their own voluntary act. We cannot see a single element of duress in this transaction. The claim now made in that behalf by defendants is clearly an afterthought."

So in this case, the defendants say that they signed the contract in order to protect what they already had in the enterprise. That they signed with full knowledge of all the facts goes without saying. Everything was laid bare in the meeting held in the Mayor's office nearly a month prior to the agreement, yet from that time on the defendants were pressing an adjustment of the difficulties. They went to St. Louis in the meantime and by written proposal offered the $40,000 in bonds, now in dispute.

So, too, in Morse v. Woodsworth, 155 Mass. 1. c. 250. The court says: "It has been often held that threats of civil suits and of ordinary proceedings against property are not enough, because ordinary persons do not cease to act voluntarily on account of such threats." For other cases see 9 Cyc., 449, n. 35.

Now to the case in hand. It is disclosed that for some reason, whether valid or invalid, Enoch was refusing to comply with the terms of the contract of date September 28th, thus a threatened lawsuit on the hands of defendant. Enoch was complaining that they were not treating him fairly. Every detail of the con-

tention was gone over on January 4th. Whatever was done thereafter was done advisedly and carefully, with each and every party in possession of his full faculties, and from under the terrorizing presence of the Mayor. If Enoch and the Peoples Telephone Company had no claim the defendants knew it, yet with all the facts before them as part and parcel of the one scheme they entered into this tri-party agreement, with their eyes open and after advice of counsel. The facts in evidence do not sustain the charge of duress in the execution of the contract. Men of parts, as these defendants are shown to be, did not have their will-power so dwarfed by the circumstances as to obviate a solemn contract which was finally drafted by them in the privacy of their own office. They no doubt knew that they had on hand a lawsuit to compel Enoch to comply with his agreement of September 28th, and it may be that they likewise knew that Enoch had at least some defense to that action. They were exceedingly anxious to compromise and did compromise and the contract in suit is the result. To our mind the contract, which is one growing out of the tri-party agreement, is not voidable for the alleged ground of duress.

IV. There is another reason that this contract should be enforced. By this compromise, Enoch was eliminated from the Home Telephone Company and the defendant saved thereby the $15,000 in bonds and $25,000 in stock to which Enoch was entitled. This part of the tri-party agreement, being beneficial to them, they have accepted. They have further recognized the validity of a second portion of the same settlement by purchasing the rights of the Peoples Telephone Company under the toll line contract. Can it be said that a party can enter into a compromise agreement having three constituent parts and can ratify and accept the benefits

under two parts thereof, and then repudiate the third part on the ground of duress. The things beneficial they keep or ratify, the things detrimental they ask to be relieved of in equity.

If a party seeks to avoid a contract for duress he must place the parties *in statu quo,* and avoid the whole contract. Contracts induced by duress are ordinarily voidable, not void, and to avoid them the party so seeking must place the parties *in statu quo* either by tender beforehand or in the bill in equity. He cannot ratify two-thirds of the compromise agreement because beneficial to himself, and repudiate the other third because against himself. He must repudiate as a whole. In this there is a difference between actions for fraud and deceit, and actions to cancel a contract for duress. In fraud and deceit, the party ratifies the contract as made, but says because the thing delivered is not up to the contract representations, I have been damaged by deceit and fraud. To cancel a contract by reason of duress the contract must of necessity be repudiated, and not only so, but the parties must be placed *in statu quo.* The party seeking to avoid cannot keep "the sweets" and repudiate "the bitter."

In this case the distinguished counsel for respondents have overlooked the fact that Enoch was a party to this compromise, and that he was likewise interested in the Peoples Telephone Company. They overlook the fact that he might, by reason of advantages to accrue to him through the Peoples Telephone Company, have been willing to surrender his disputed claim as to whether or not defendants had lived up to the contract of September 28th. In fact, they seem to have overlooked the fact that out of the compromise agreement they have hung with a death grip to the benefits and are now seeking only to separate the consideration given for those benefits, with no effort to place the parties in the position they were in prior thereto.

In 10 Am. and Eng. Ency. Law (2 Ed.), p. 334, it is said: "In general, a contract made under duress is only voidable and not void; hence, the one on whom the duress has been imposed may either repudiate or affirm it."

And the same authority at page 337 says: "Where it is sought to avoid a contract because induced by duress, the person seeking such avoidance must proceed within a reasonable time after the removal of the duress. If he remains silent for an unreasonable length of time, or if he keeps property which he may have acquired under the contract, or recognizes the validity of it, either by making payments thereon or otherwise, he will be held to have elected to waive the duress and ratify the contract."

So in this case we say that there was a tri-party agreement made. It was a compromise agreement in view of threatened litigation which agreements are favorites of the law. The defendants have kept property to which they were not entitled, except for this contract. They have ratified and approved by their own act another portion of the contract by purchasing the toll line contract. They cannot ratify in part and disclaim in part. They for two years or more delayed their disclaimer, even as to the third part, when the law demanded a prompt disavowal of the contract. With all other questions eliminated the question discussed in this paragraph defeats the claim of the defendants. They only claim that it was the fear of loss in their project to construct this telephone system that compelled them to sign the agreement. Such would avoid all compromise agreements. If a lawsuit is actually pending and a contract to settle is made, it is usually upon the theory that each party fears loss by a continuance of the suit. If two parties lay claim to the same property, and they settle their differences, it is usually upon the theory that they fear loss in money or property, provided it is not settled. Nor

do parties whose will power has been so subdued that they cannot make a contract, usually require two years to discover the fact, and if they do, it might be well said that they were guilty of laches in not sooner discovering the state of their mind at the time the contract was made. Rescission of a contract for fraud must occur on the discovery of the fraud. [Taylor v. Short, 107 Mo. 384.] By parity of reasoning a rescission for duress must occur when the duress is removed. There are really laughable features in this contest between two modern giants of commerce, when we think of the womanish plea of duress.

V. Nor is there anything in the want of consideration for this contract. We have indicated that there was a valid compromise made between these parties. If there was a valid compromise, such furnishes a sufficient consideration for the contract in suit. In the early case of Reilly v. Chouquette, 18 Mo. l. c. 226, Scott, J., said: "When a right is disputed and a compromise ensues, that compromise will not be disturbed, should it turn out afterwards that one of the parties had no right in law. Such a principle would overthrow all compromises. The compromise of a doubtful claim is a good consideration for a contract." See also Livingston v. Dugan, 20 Mo. 102, and Hill v. Coal Company, 124 Mo. 153. The terse language of Judge Scott expresses the law, and we shall go no further on this question.

VI. The burden was on defendants to overturn this contract. It cannot be said that the proof sufficiently shows that the St. Louis syndicate had knowledge of the contract of September 28th. It may be admitted that they did know that Barber had assisted Enoch, but when Enoch avowed that he would not deal with them further, the St. Louis syndicate could at least deal with Enoch by standing in Enoch's shoes. Then even say that they stood in Enoch's shoes, they

would be denying the right of the Ohio syndicate to enforce the contract of September 28th. If they and Enoch were denying that right, then such was a legitimate matter of settlement and compromise, and a compromise contract made after a full discussion and meeting of the parties, as was this, should not be disturbed. However, the facts of this case do not require us to go thus far. But we see no reason why, if Enoch had as a fact notified the St. Louis syndicate that he had contracted the franchise to the Ohio syndicate but that they were not treating him right and not living up to the contract, and for that reason he would not comply with his part of the contract, the St. Louis syndicate could not have bought the franchise, and as to whether or not they obtained title would be dependent upon the one question of what the Ohio syndicate had done toward faithfully carrying out the agreement with Enoch. Suppose Enoch had shown Stark this contract of September 28th and then told him that he wanted to sell this franchise, because Barber has not lived up to the contracts: wouldn't Stark have had the right to buy? What he bought might be a different question. If as a fact Barber had lived up to that contract, he would have bought nothing. If not, he would have bought much. Might not these questions account for the activity of Barber, Brailey and Snider in visiting St. Louis to get the matter settled? A consciousness *sua sponte* might have suggested to them that Stark had bought something rather than nothing. This, however, is by the wayside. There is no evidence fixing knowledge upon Stark of this contract prior to the assignment. That there was a *bona fide* dispute between these parties, including Enoch, is apparent. That they ultimately settled it, and as a third part of that settlement the contract in dispute was executed, is undisputed. Back of this settlement defendants in good conscience should not go at this time and under all the circumstances.

VII.   By agreement of counsel 400 shares of stock of the character named in the contract were deposited with the Fidelity Trust Company, under these conditions: "—— said stock to be held by said Fidelity Trust Company subject to the order of the court in this case, and to be transferred to plaintiff in the event that the court should so order, or returned to defendants if so ordered until final determination of said cause; that said defendants will pay the fees and charges of said Fidelity Trust Company for holding said certificates of stock under this agreement and disposing of the same under the order of the court in this cause; that upon the deposit of said four hundred shares of stock with said Fidelity Trust Company, and the execution of an instrument by said trust company acknowledging the receipt thereof and agreeing to hold the same subject to the order of the court in this cause, the restraining order heretofore issued in this cause may be modified so as to apply to only four hundred shares of the capital stock of said Kansas City Home Telephone Company, and so that it shall not operate to restrain the transfer of the stock of these defendants in excess of four hundred shares."

It appearing to this court that this contract should be specifically performed if valid, and it further appearing to us that it is valid and binding, and this aforesaid stipulation appearing in the record, we are of opinion that this judgment should be reversed, and this cause remanded, with directions to the circuit court to enter up judgment for the plaintiff for the said stock so held under the stipulation, and to the further effect that plaintiff have the dividends if any have been declared thereon since the deposit of the same under the stipulation aforesaid.   Judgment reversed and cause remanded with the directions aforesaid.   All concur except *Valliant, J.,* absent.