BENNETT et al. v. MAHON.

No. 13989.

United States Court of Appeals Eighth Circuit.

Feb. 14, 1950.

Rehearing Denied March 8, 1950.

Writ of Certiorari Denied June 5, 1950.

See 70 S.Ct. 1027.

Herman M. Langworthy, Kansas City, Mo. (Charles M. Miller, Kansas City, Mo., was on the brief) for appellants.

Paul R. Stinson, Kansas City, Mo., (Lawrence R. Brown, Dick H. Woods, and Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, Mo., on the brief) for appellee.

Before GARDNER, Chief Judge, and WOODROUGH and THOMAS, Circuit Judges.

WOODROUGH, Circuit Judge.

The appellant, George Bennett, an established construction contractor of Kansas City, Kansas, has held the contract with the City of Kansas City, Missouri, for the collection and disposal of the city garbage since April, 1945, the work commencement and termination dates of his contract being July 16, 1945, and April 30, 1955. He sublet a part of the work to his brother, the appellant Harry Bennett, in September, 1945, with the consent of the City and without any diminution of his own obligation, and they are and have been since July 16, 1945, engaged in carrying out the contract. The enterprise is of considerable magnitude and has at times required an outlay of money on the part of George Bennett up to $328,000 for facilities, equipment, purchase of hogs for feeding and organization and operation expenses.

The appellee, C. A. Mahon, worked for George Bennett in the enterprise as an employee under a written contract of employment which he entered into with Bennett on March 12, 1945, from the time of the award of the contract to Bennett until some time in August, 1945, and thereafter his connection with it terminated.

On the first day of June, 1946, he brought the present action against George Bennett and Harry Bennett in the State court in Missouri and it was removed to the federal court which had jurisdiction by reason of diversity of citizenship and requisite amount involved.

The petition presented a combined action in equity and at law in which the plaintiff sought to establish an oral contract of partnership with the defendant George Bennett for carrying out the garbage collection and disposal contract between the city and Bennett and to enjoin interference with plaintiff's participation as an equal partner therein and for an accounting; or in the alternative, to recover damages for an alleged breach by Bennett of the written contract of employment.

It was alleged in substance that the ten year contract between Kansas City, Missouri, and Sanitary Service Company for the collection and disposal of garbage in Kansas City, Missouri, was about to expire in July, 1945; that plaintiff had acquired information in respect to the requirements relating to the collection and disposal of garbage; that beginning in November, 1944, and for several months thereafter plaintiff entered into negotiations with the defendant George Bennett, with the result that an oral agreement was entered into between plaintiff and said Bennett under the terms of which said Bennett was to submit a bid to the city for the collection and disposal of its garbage, if and when the City of Kansas City should advertise for such bids; and if the submitted bid resulted in an award, the plaintiff and said defendant George Bennett would perform the contract with the city under a partnership or joint adventure agreement between them whereby the plaintiff would devote all of his time, efforts and abilities to the management and operation of the collection and disposal business and contribute $10,000.00 in cash towards the capital of the joint adventure, and the defendant George Bennett would make an initial contribution of $150,000.00 in cash toward the capital of the joint adventure and as much more as was necessary, upon the further agreement and understanding that the profits and losses from the operation of the business would be shared equally between the plaintiff and the defendant George Bennett and upon the further agreement and understanding that

the cash capital contributions of plaintiff and defendant George Bennett would be returned to them out of profits in proportion to their respective cash contributions;

That the city advertised for bids to be opened on March 12, 1945; that a bid was submitted by George Bennett; and said George Bennett was thereafter awarded the contract by Kansas City, Missouri, for the collection and disposal of garbage for the city during the period from July 16, 1945, to April 30, 1955;

That on March 3, 1945, the defendant George Bennett notified plaintiff that he would not go through with said alleged oral agreement of joint adventure; but that if he (Bennett) was awarded the city contract, he would employ plaintiff for the period of the awarded contract at the rate of $600.00 per month and ten percent of the profits; that plaintiff could accept said offer or be deprived of any participation whatever in the garbage collection and disposal business;

That because of the coercion, duress and business compulsion of the said defendant's threats, the plaintiff's will was broken down and overcome and he thereafter on March 12, 1945, prepared and entered into a written contract with the defendant George Bennett whereby if the garbage contract was awarded to said Bennett, said Bennett would employ the plaintiff as general manager at $600.00 per month and ten percent of the profits;

That in April, 1945, plaintiff began the management and operation of said garbage contract with the city for the defendant George Bennett under said written contract, and proceeded to devote his time and efforts to said enterprise, until about August 29, 1945, when the defendant George Bennett without reasonable cause notified the plaintiff that he was no longer connected with the organization, "and thereby wrongfully and without reasonable cause or excuse breached both the oral agreement of joint adventure and the written agreement, into the signing of which the plaintiff had wrongfully been coerced";

That thereafter in September, 1945, an agreement was entered into between defendant George Bennett and defendant Harry Bennett whereby that part of the garbage contract relating to the collection of garbage was sublet to Harry Bennett;

That shortly before the filing of this suit, plaintiff's mind was for the first time removed from the duress of the threats of the defendant George Bennett, and plaintiff was first advised of his rights under said oral joint adventure agreement, notwithstanding the signing of the written agreement; and that plaintiff stands ready to perform said oral agreement of joint adventure; and in the prayer:

That the court find and decree that the plaintiff and defendant George Bennett entered into the oral agreement of joint adventure above referred to; that the defendants be enjoined from interfering with the plaintiff's right to participate jointly therein; that defendants be required to account to the plaintiff; and that the court find that the written contract was entered into through duress and coercion;

That, in the alternative, plaintiff recover as damages for the wrongful breach of the written contract, the sum of $500,000.00.

The defendants filed separate answers and the issues which were joined for trial included the issues whether or not George Bennett and Mahon entered into the oral contract of partnership or joint adventure alleged in the petition and the issue whether Mahon's "will was overcome and broken down by coercive duress and business compulsion threats" so that he was not bound by the employment contract when he signed it and remained free of obligation under it notwithstanding he worked and drew his pay under it for five months.

Those issues were tried by the court in equity. It used a jury in advisory capacity and received its verdict responding in plaintiff's favor to special interrogatories and made findings of fact and conclusions of law declaring, i. a., that "plaintiff is entitled to full and equal management and control and operation of the collection and disposal of the city garbage under the contract awarded to Bennett and if Bennett attempts to exclude plaintiff from partici-

pation in the work plaintiff will be entitled to an injunction."

By the judgment entered, D.C., 81 F. Supp. 901, it was decreed that plaintiff and defendant George Bennett are joint adventurers each with an equal interest in the garbage collection and disposal contract, and the fruits thereof, between the City of Kansas City, Missouri, and said George Bennett, beginning July 16, 1945, and ending April 30, 1955, and each with an equal interest in all property, real, personal, and mixed, acquired in performing said contract or in connection with the operation thereof; and that each is equal in power, right and obligation in the operation and management of the business and in performing and carrying out said contract and in the financial rights and obligations flowing from said relationship.

The decree contains provisions to compel the carrying out of the city garbage contract during the rest of its term by Mahon and George Bennett working as equal partners together and also to compel accounting for past profits and division of those to be earned in the future. It contains no provisions as to how money should be raised if such working together fails to produce enough money during any period although the enterprise involves many hazards.

The equitable relief accorded the plaintiff was treated as disposing of the alternative law action for damages for alleged breach of the employment contract included in the petition. This appeal taken by George and Harry Bennett therefore is to review the proceeding and judgment in equity and is governed by the Rules applicable to appeals in equity.

Among the errors assigned and argued for reversal of the judgment the appellants contend that the following finding of fact made by the court was clearly erroneous: "Plaintiff Mahon signed the written agreement of March 12, 1945, because he was wrongfully coerced into doing so by the acts and conduct of the defendant George Bennett, in such manner that plaintiff's signature to the agreement was obtained by wrongful coercion and duress, and not by the exercise of his own free will." Appellants contend that the finding is not supported by and is contrary to the evidence and requires reversal of the judgment.

On turning to this question first we note that the court's finding is very general and does not specify any particular "acts and conduct" of Bennett towards Mahon found to be wrongful or to amount to duress and coercion and deprivation of Mahon's exercise of his free will. There was no general finding that the allegations of the petition were true.

Accordingly, we have made independent examination of the record, recognizing that we should sustain the finding unless it was clearly erroneous.

It appears that Mahon first called upon Bennett at his office on November 4, 1944, and informed Bennett of the fact that there was a possibility that the City of Kansas City, Missouri, would not renew a contract it then had with the Sanitary Service Company for the collection and disposal of city garbage, that the contract would expire in July, 1945, and that the city might call for bids for a new contract. Bennett's life work had been first working a team on a farm and then on up to contracting for road, highway, railroad and latterly, airfield construction. He was experienced and successful in appraising, bidding on, contracting for and performing such work. He saw that collection and disposal of garbage would involve the use of trucks and an organization of men to handle a large tonnage of material, and although he had less experience in hog feeding he immediately indicated an interest in the possible letting of a contract spoken of by Mahon. Mahon was then in the employ of the city as manager of the City Hall building but he had served the city one year as chief garbage inspector. He had never had experience in carrying on any such work as collecting and disposing of garbage by feeding it to hogs, but he thought he could carry on such an enterprise. He told Bennett that if the Sanitary company's contract should be terminated and if the city should call for bids and let a new contract, the contractor would be obliged to invest

$160,000, and that he wanted to get a position to manage the operations under such a contract, and a half interest in it if it should be let, and that he could and would invest $10,000 of his own money. Mahon had no information as to what the city's contract specification would be in case it decided to call for bids and make a new contract, but he ventured several estimates as to the kind and amount of equipment and facilities a contractor would require and of what he thought was the probable cost of the garbage collection. He also made estimates of the number of hogs that could be fed and of the cost of 150 pound hogs and their sale value with 170 pounds added by feeding on garbage.

As Bennett indicated that he would be interested in a contract for the collection and disposal of city garbage in case the city decided to call for bids on it and also in associating Mahon with him in such an enterprise, Mahon continued to call on Bennett at his office and to talk to him about the matter frequently. The evidence is vague as to what Mahon had to say during these numerous calls. The record does not show that he had or obtained or gave Bennett any specific information of his own knowledge which proved to be of any importance relative either to the intentions of the city or to the collection and disposal of the city garbage. He wrote Bennett two letters in which he set out some estimates of profit possibilities based on speculative costs and also some suggestions as to possible forms of bids which he said might be used with some revision. In both letters he repeatedly used the pronoun "we" and the adjective "our" applied to estimates of profits, costs and alternative bids and figured "our" profits fifty-fifty.

It is not shown at just what time the Director of Public Works who had such matters in charge for the city, determined to call for bids on a new garbage contract but he did decide to do so and his preliminary specifications embodying the terms of such a contract first came into the hands of Bennett and Mahon on February 12, 1945. After that date the Director added two amendments to the specifications, the second one on March 3, 1945, and Bennett obtained assurance from the city officer at that time that the specifications were complete. They extend over forty-two pages of the printed record and included all the requirements of the contract, the several alternative forms of bids, and many details for the information of contractors. The last addendum advised that the contractor could obtain from the city and the Sanitary Service Company the hog feeding lot and facilities which Sanitary had previously used for that purpose for the term of the new contract.

It is clear from the evidence that Bennett could not and did not make up his mind what he was going to do in the matter of bidding on or contracting for the city garbage work until he got the completed specifications. They informed him as to the garbage tonnage in preceding years, the facilities available for hog feeding, the prescribed equipment to be used for collection and hauling garbage and many obligations to be complied with. They gave him a basis on which he as an experienced contractor could go forward, and with the assistance of the qualified men he had in his employ make an appraisal of the work, the necessary investment, the possibility of profit, and whether or not to make a bid and on what terms.

As soon as he had the completed specifications Bennett told Mahon what he would agree to do in the matter of associating him in the enterprise. He asked Mahon how much he was making in his employment with the city, and on being told that it was about $300 a month offered to pay him double that amount or $600.00 a month, and in addition, to allow him ten percent of the net profits. In making the offer he set no time limit for its acceptance or rejection. He stated to Mahon that he had decided and intended to bid on the garbage contract.

Mahon took the offer under consideration and left the office. He had let Bennett know from the beginning of their talks on November 4th that he wanted to have a partnership share in a contract if one was let, and during all the time he was going to see Bennett and talking to him, Bennett had reason to believe that Mahon was hop-

ing or expecting that an agreement in writing would be arrived at between them. Mahon gave testimony to the effect that as early as November 11, 1944, one week after he and Bennett had first met each other, he had orally made his proposal to Bennett to enter into a contract to obtain the garbage contract in Bennett's name and carry it out through an equal partnership between them in which Bennett would invest $150,000 and Mahon $10,000 and that Bennett orally accepted and agreed to it. But his further testimony was to the effect that that oral agreement was mutually abandoned. That he and Bennett decided that $160,000 would not be enough money to carry out such a contract as was likely to be offered. Mahon said that afterwards a new or modified oral agreement was entered into between himself and Bennett sometime in January, 1945, by the terms of which Bennett agreed to invest all the money "necessary" without regard to the limitation of $150,000 and still divide the profits on the same fifty-fifty basis. Mahon did not specify particulars of what had happened or had been found out which caused the abandonment of the first alleged oral contract, but his testimony reflects his full understanding that as late as January, 1945, there was no basis on which Bennett could appraise the work or make any approximation of the amount of money that would be required or that he agreed to invest.

Mahon testified very freely and at great length. He was positive that Bennett had orally agreed and bound himself to a contract, but Mahon's difficulty was to define what he claimed it was agreed either of the partners was to do. The terms "management and operation" which Mahon said were to be his part, may convey a reasonably definite concept applied to a going business, long established and proceeding under a manager according to custom. But here the matter was first that the city should define through specifications the work it wanted, and then set up and carry

on a new enterprise that would involve the acquisition of facilities and equipment and assembling, organizing and directing men and handling garbage and hogs. Mahon testified he was glad to get out of his former job of garbage inspector because he did not like the odor of the garbage and his voluminous testimony makes it very clear that in the oral agreement he said Bennett made with him, there was no understanding as to how close Mahon was to be to the garbage handling or handlers which was the subject matter of their negotiations. Nor did he say who was to decide on that important matter when the work should start. The testimony on the trial covered what occurred at the start of the work and it was shown beyond question that Mahon would not stay at the little office put up adjacent to the garbage scales and the garbage hog feeding lot for directing the work, though there was evidence tending to show that that was necessary. The evidence was convincing that he was not competent to start the work off properly; that uncollected garbage accumulated dangerously in the July heat, and that the whole enterprise was put in jeopardy until Bennett brought in competent and experienced persons who took over and redeemed the situation.[1]

On the other hand, he could not say how much money Bennett agreed that he would put up. Although he claimed Bennett agreed that he would invest all that was "necessary" he could not say that there was any agreement as to who would decide what was "necessary." The enterprise had to have a head to it, and the alleged oral agreement did not provide for one.

But it is clear from Mahon's testimony that he carried on all the negotiations he had with Bennett about the garbage collection and disposal in the expectation of arriving at an agreement in writing. He so testified and he fully understood that in view of the large amounts involved, the length of time the work was to go on, its many complications, and the extraordinary kind

---

1. Bennett denies, however, that he discharged Mahon. He says that he liked Mahon and that he was always confident that he would find work within the terms of the employment contract for Mahon to do in spite of his manifest incompetency to manage the initial stages of the enterprise.

of agreement he was seeking, a writing would be required in order to define the undertakings of the parties. He never even attempted to formulate such a writing, much less to submit one to Bennett before the third day of March, 1945, when the final specifications of the city for the first time disclosed what the work was on which the city called for bids. Mahon's claim that Bennett orally agreed upon any contract between them prior to that time rests solely on his testimony and it is not corroborated or supported by any other witness or any unequivocal fact or circumstance found in the record.

When, on the other hand, we turn to Bennett's testimony we find a clear and credible account of what occurred between him and Mahon. Bennett was favorably impressed with Mahon when Mahon called on him and the contract which Mahon said might possibly be let on the call for bids by the city was in his line of work. Bennett understood that Mahon wanted to become associated with him in the work and had exaggerated ideas of what he might contribute to it and get out of it, but as nothing concrete could be done about that until the city should decide to terminate the garbage contract of the Sanitary Company and publish specifications and call for bids on a new contract he never gave a thought to making any contract about it with Mahon, and did not make any such contract. He accepted the purely speculative figures Mahon sent him as to the profits in hauling garbage and in feeding hogs, but as he had qualified men employed on whom he relied to investigate and to submit data to assist him in bidding on public work he in no way depended on the inexperience of Mahon. But when the completed specifications submitted by the city on March 3, 1945, for the first time accorded to him the information and a basis upon which he could make an intelligent bid he immediately informed Mahon that he intended to bid and made Mahon his offer of the terms upon which he would associate Mahon in the enterprise if he got the contract.

Although the details of what occurred upon Bennett's communication of his terms to Mahon and afterwards until the offer was accepted and the contract signed are elaborated, we find no conflict as to any matter of substance. Mahon says he protested that there already was a contract and Bennett denies that, but our careful search of the record has not disclosed any act or conduct on the part of Bennett from which any coercion, duress or oppression of Mahon can fairly be inferred. As to the situation then existing, the time which remained for bidding was nine days which was the full time allowed by the city between the call and the bidding date to any and all contractors who might want to bid; as Bennett told Mahon he was going to bid, Mahon was assured that if he wanted to stand on his alleged oral agreement the subject matter of it (i. e. the garbage contract) was going to be preserved as far as Bennett could do so; Bennett put no time limit on his offer to employ Mahon and Mahon was free to take or leave it as he chose. The offer itself proposing a salary of $600 a month and a share of the profits which Mahon believed would bring his share to between $20,000 and $30,000 a year was many times as much as Mahon was earning by his work for the city.

Contentions are made that when Bennett made his offer Mahon did not have time before the date of the bidding to find some other contractor who would furnish the money and give him a half interest in the profits of a contract to be secured by competitive bidding; but there was neither proof nor any reason to believe that he knew of or could ever have found such a contractor. It is clear that there was nothing in the situation which existed at the time Bennett made his offer which rendered the timing of it oppressive or unfair. It was made on the first day when Bennett had to commence figuring what he could count on when he came to bid. In order to bid he had to determine and let his banker know of any commitments made by him to an outsider.

Mahon was at Bennett's office when he received the offer to employ him and took it under consideration. He reflected upon it and took advice of his lawyer. It is true, as Mahon knew at the time, that the

lawyer had done some work for Bennett as well as for himself, but there is no claim that the lawyer's advice was not honest and disinterested. Mahon also returned to Bennett and proposed to him that Bennett give him fifteen percent of the profits instead of ten. He may have made other proposals. But nine days elapsed before Mahon went to Bennett's office on March 12th and submitted to Bennett the form of contract of employment which Mahon wrote up himself on the typewriter in his office in the City Hall. It does not appear that Bennett during the whole time said a word to Mahon to influence his decision as to whether he should accept the offer of employment or reject it.

In the opening paragraph of the writing Mahon declared:

"George Bennett and C. A. Mahon are interested in associating together for the purpose of collecting and disposing of garbage in the event George Bennett obtains a contract for garbage collection with Kansas City, Missouri, and have reached the following understanding." Then follow the terms of the employment for the performance of personal services by Mahon for Bennett.

When it is borne in mind that Mahon then well knew that Bennett expected to obligate himself for large sums of money and to borrow hundreds of thousands of dollars to carry out the contract he hoped to get and that every commitment he made had to be taken into account when he came to make his bid and to enter into any contract awarded under it, it may not be assumed or argued that Mahon did not appreciate the serious importance of this declaration of the terms on which he was associated in the enterprise. If it be supposed that he did honestly think that Bennett had orally agreed at some time during their negotiations to an association between them on other and different terms he could not fail to realize that when he wrote up and submitted and affixed his signature to this document and put it into Bennett's hands for Bennett to rely on in the commitment of his own fortune and the commitment of large sums of money to be obtained from other people, he ought in honesty to be bound by it.

That he did so realize is manifest from his own testimony. He said, "I thought that I would have to comply with the conditions of the written contract which we had both signed and that that would destroy the original contract which I had had with Mr. Bennett."

It is true that this court has heretofore recognized, as we now do, that under the law of Missouri applicable here extraordinary circumstances and conditions may be presented in which a written contract may be avoided for coercion, duress or deprivation of the exercise of free will on the part of the signer. It may be done even though actual physical coercion or violence or fear of violence is not shown. But that is not to say that in Missouri or elsewhere in this country a contract thus knowingly and understandingly entered into can be avoided merely because it was entered into as a substitute for and in the place of some other contract covering the same matter, the existence of which is asserted by one and denied by the other party to the said contract. It is well settled that a mere refusal to carry out a contract, even an established and proven one, does not of itself constitute coercion or duress or any ground to avoid a new contract covering the same subject matter. Hartsville Oil Mill v. United States, 271 U.S. 43, 46 S.Ct. 389, 70 L.Ed. 822; McKenzie-Hague Co. v. Carbide & Carbon Chemicals Corp., 8 Cir., 73 F.2d 78, 84; Wood v. Kansas City Home Telephone Co., 223 Mo. 537, 123 S.W. 6; Furman v. Gulf Insurance Co. of Dallas, Texas, 8 Cir., 152 F.2d 891, 894.

It was contended for Mahon in the trial court and is now argued here that Mahon did not know his legal rights under his alleged oral contract at the time he entered into the written employment contract and therefore duress could be found. But the point is without merit. The power to make binding contracts is not confined to lawyers. Mahon knew all the facts upon which he decided to enter into the employment contract and could not assert ignorance of law

to enrich himself unjustly at the expense of those who relied on the contract in writing which he entered into with the full knowledge and intent that it should supersede his former alleged contract. He knew that his claimed oral contract was strange and improbable, and that it rested solely on his uncorroborated word against Bennett's. He knew of the Missouri statute, "No officer or employee of the City shall have a financial interest, direct or indirect, in any contract with the City." (Section 472 of the City Charter of Kansas City, Missouri). He knew of the law's delays and the uncertainties of litigation, and on the other hand the proposed employment contract offered him many times what he had been able to earn and over a period of five months he worked under the contract and took the stipulated pay for his services. His argument is in effect that he was not aware of all the contentions an able lawyer could have made on his behalf if he had decided to bring a suit on his alleged oral agreement instead of entering into the contract he did enter into. Or that he could have claimed a half interest in the garbage contract when Bennett got it, or that it could have been argued that words ascribed to Bennett when he made the employment offer ought to be deemed threats and hence coercive. He says Bennett said that if Mahon did not accept the employment offered Mahon would be out. But it may not be held to accomplish the result arrived at in this case that Mahon looked to or relied on Bennett to tell him what the law was. Mahon was in the prime of life at the age of 54, sound of body and mind, and under no kind of constraint or compulsion. He was not poor but had $50,000 of liquid assets and a position with the city that paid him more than a living wage. He had more book learning than Bennett had, and besides much and varied experience in business, had been a worker in a city election with 21 precincts under him and sharpened his wits during five year occupancy of office in the City Hall. He did not say, and could not, that he did not know that the courts of the country were open for the redress of wrongs and that he did not know that if he had a contract which he could prove, with a rich man who threatened to or did breach the contract to his damage he could not hire a lawyer and get justice in the courts. He advised and consulted with his lawyer about the decision he had to make on Bennett's offer of employment in order to make up his mind in the situation as it then stood. Undoubtedly the lawyer expressed his honest opinion. It may not be held in such circumstances that Mahon was not bound by his written contract deliberately and carefully written by his own hand after long reflection and consideration and presented by him to the other party who accepted and relied on it and obligated himself and others to great commitments on account of it.

We are accordingly convinced that the finding that Mahon was coerced into contracting for employment and that he did not so contract of his own free will was clearly erroneous and must be set aside. The finding is not sustained by substantial evidence. United States v. United States Gypsum Company, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746. We conclude that the relationship between Mahon and Bennett in respect of the garbage contract was evidenced and established by the written contract of employment of March 12, 1945, and not by any alleged oral contract. The decree appealed from undertaking to enforce such alleged oral contract is, therefore, reversed at the cost of appellee with direction to dismiss the action as to Harry Bennett and to dismiss it as to George Bennett except only as to the action for damages for alleged breach of the written contract of employment. We express no conclusions in respect to that action.

Reversed and remanded for dismissal of the equity action and for further proceedings on the law action set forth in plaintiff's petition.