W. R. GRIMSHAW COMPANY and National Surety Corporation, Appellants,

v.

NEVIL C. WITHROW CO., Inc., Appellee.

No. 15768.

United States Court of Appeals
Eighth Circuit.

Oct. 21, 1957.

Rehearing Denied Nov. 15, 1957.

Remington Rogers, Tulsa, Okl. (Paul W. Brightmire, Tulsa, Okl., was with him on the brief), for appellants.

Cooper Jacoway, Little Rock, Ark., for appellee.

Before SANBORN, WOODROUGH and VAN OOSTERHOUT, Circuit Judges.

WOODROUGH, Circuit Judge.

On September 12, 1951, the University of Arkansas entered into a contract with the W. R. Grimshaw Company, an Oklahoma corporation, as general contractor, to construct the University Medical Center at Little Rock, Arkansas. In compliance with the requirements of the contract, the Grimshaw Company executed, as principal, a bond on which the National Surety Corporation of New York was surety.

In compiling their prime bid for the overall contract on the Medical Center, the Grimshaw Company prepared detailed cost estimates on the work they planned to perform themselves, but left specialty items, such as windows, doors, terrazzo, et cetera, to specialty companies that are familiar with them. They depend on these companies to quote a price for which the companies, under sub-bids, can furnish the necessary materials and perform the required labor. In that connection and in order to prepare a sub-bid for the aluminum windows, ornamental doors and X-Ray protection, the Nevil C. Withrow Company, Inc., an Arkansas corporation specializing in aluminum windows—subcontracts and furnishing material and supplies in connection therewith, secured a set of blue prints and specifications from the architect for use in compiling their sub-bid on the Little Rock Medical Center.

On September 28, 1951, Nevil C. Withrow, president of the plaintiff company, confirmed his sub-bid to the Grimshaw Company covering "Item 1, aluminum windows, Section M-1 to M-5 for $310,-000.00 and the erection thereof for $25,-000.00 more, a total of $335,000.00". The bid was accepted and the amount was included in the sub-contract between the Grimshaw Company as prime and Withrow Company as sub-contractor, dated September 26, 1951.

In June of 1952, the Shop Drawings, required under the contract, showing in detail the material the window manufacturer expected to supply in connection with the sub-contract, were submitted to Grimshaw Company by Withrow. They indicated that Ware Laboratories were to do work for Withrow Company. On July 7, 1952 the Shop Drawings were returned to Withrow for correction and resubmission. The Shop Drawings at "Section 29" were labeled "Not by Ware Laboratories." This referred to the Shop Drawings that Ware Laboratories prepared for the Withrow Company and in each case that the sills—interior and exterior—were indicated on the Shop Drawings, there was a notation "Not by Ware Laboratories nor W. C. Withrow Company." A conference with the superintendent for the Grimshaw Company and subsequent correspondence between Withrow and the Grimshaw Company during the period March through July, 1953, shows a dispute between the companies with Grimshaw contending that under the specifications, Section M-1 through M-5, Withrow was required to furnish the specified window stools and sills. Withrow maintained that Section M-1 through M-5 did not provide for the stools and sills and that he had bid

on the stools and sills under Section J [1] of the specifications, a section not awarded his company under the sub-contract.

During the correspondence that followed, over a period of 15 weeks, the Grimshaw Company insisted that unless Withrow installed the window sills and stools under the sub-contract, the work would have to be performed by someone else and back-charged to Withrow or Withrow's sub-contract cancelled in its entirety. On June 23, 1953, Withrow wrote Grimshaw that he recognized that their position was sincere and on July 2, 1953, Withrow wrote the Grimshaw Company:

"* * * We dislike involving others in the controversy that has arisen between your Company and ours as to whether the exterior sills and interior sills (as shown on the architect's plans) are included in our Company's sub-contract. It would seem impractical to do so at this time although our construction of what is covered by our sub-contract remains unchanged.

"Therefore, Nevil C. Withrow Company, Inc., is proceeding to include and furnish said exterior sills and interior sills (as shown on the architect's plans) which are in dispute and future shop drawings will be changed accordingly.

"Please delete from shop drawings in your possession note pertaining to exterior and interior sills so that resubmission will not be necessary."

Grimshaw Company acknowledged receipt of the letter containing the agreement on July 6, 1953, and wrote Withrow as follows:

"We acknowledge receipt of your letter dated July 2, 1953, wherein you state, 'Nevil C. Withrow Company Inc., is proceeding to include and furnish said exterior sills and interior sills (as shown on the architect's plans) which are in dispute and future shop drawings will be changed accordingly.'

"Please be advised the sills referred to are to be furnished and installed in strict accordance with the specifications Section M-1 through M-5, applicable drawings, Addenda No. 1, 2, 3, and 4, and subject to the terms of the contract. The foregoing are the provisions of your contract, and under these conditions you may proceed with the execution of your contract in its entirety."

Withrow then proceeded to furnish the stools and sills and perform the necessary labor and the percentage payments made to and accepted by him under the sub-contract, as the work progressed, included allowance therefor. Withrow was paid in full, except as to the ten per cent retainage.

On February 26, 1956, the Withrow Company brought this action at law in the United States District Court for the Eastern District of Arkansas and alleged in substance that on or about October 23, 1951, Withrow Company entered into an agreement with Grimshaw Company which provided that Withrow Company should furnish certain labor and materials in connection with the construction of the University of Arkansas Medical Center and that Grimshaw Company agreed to pay to Withrow Company, for said labor, material, et cetera, the sum of $335,000.00; that Withrow Company has now completely performed all its obligations under the contract; that on or about June 8, 1952, Grimshaw Company and Withrow Company entered into a further agreement in which Withrow Company agreed to furnish certain other

---

1. Section J of the specifications is, in pertinent part, as follows:

Section J.

*Architectural Non-Ferrous Metal*

"1. Scope. The work covered by this section of the specifications consists in furnishing all labor, equipment and materials, and in performing all operations in connection with the installation of products constructed of bronze, aluminum and other non-ferrous metal, complete, in strict accordance with this section of the specifications * * * Under this heading are included aluminum hoods, canopies, sills, certain openings and frames, trim, cast aluminum ventilators * *."

labor, material, et cetera, in connection with the seventh floor addition to the Medical Center and Grimshaw Company agreed to pay to Withrow Company the sum of $64,589.95 for said labor, material, et cetera, and that Withrow Company has now completely performed all its obligations under said contract; that Grimshaw Company has retained the sum of $24,180.42 as retainage on the original contract and Withrow Company is entitled to that sum with 6% interest; that in connection with the original contract dated September 26, 1951, Grimshaw Company requested Withrow Company to furnish certain additional material, labor et cetera, not included in the contract dated September 26, 1951, or in the subsequent contract; that said materials were furnished by Withrow Company, as extras and in addition to either or both contracts, and Grimshaw Company received the benefit of the extras and was paid for same by the Board of Trustees of the University of Arkansas; that Grimshaw Company ordered and directed Withrow Company to furnish said extras and agreed to pay for them; that the fair and reasonable value of said extras totals $23,555.94, said amount has been due and owing to Withrow Company since on or about December 8, 1954; that Withrow Company has repeatedly requested Grimshaw Company to pay said sum and Grimshaw Company refuses to pay. Judgment was prayed accordingly.

Grimshaw Company and National Surety Company answered, specifically denying that Grimshaw Company ever requested the Withrow Company to furnish any additional material, labor, et cetera, not included in their contracts; that the sub-contract dated September 26, 1951, did require Withrow Company to furnish the sills and stools (which were the "additional materials, labor, et cetera," referred to in plaintiff's complaint and claimed to be extras); that they had been furnished and paid for; that after a dispute had arisen as to said requirement of the sub-contract, Withrow Company had agreed to furnish the disputed items under its sub-contract and they were so furnished, not as extras.

Grimshaw Company admitted owing the $24,180.42 retainage, paid that amount into court and on January 28, 1957, the judgment as to the retainage was satisfied.

Withrow Company in reply to Grimshaw Company's answer admitted the written agreement to furnish the sills and stools and that: "the plaintiff furnished said extras at the request of the Defendant Grimshaw Company and at a time when the Defendant Grimshaw Company exercised economic duress and economic coercion over the plaintiff. Said duress and coercion were employed by the Defendant Grimshaw Company after the Plaintiff had expended and had caused to be expended large amounts of time and money in preparing to discharge and in discharging its obligation under its contract with Grimshaw Company; said duress and coercion were exercised by the Grimshaw Company's threatening, without warrant or right, to deprive Plaintiff of the benefits of its contract by violating the contract and by threatening to attempt to cancel the contract between the Plaintiff and Defendant * * * and by threatening, without warrant or right, to have said extras furnished by someone else and to charge the cost of said extras to this Plaintiff."

The issues were tried to a jury and were decided by having the court submit to the jury three special interrogatories which were answered favorably to plaintiff. Defendant's motion for an instructed verdict made at the conclusion of the evidence and its motion for judgment notwithstanding the verdict were denied and based on the jury's answers to the interrogatories the court awarded judgment for the plaintiff in the amount of $20,000.00 together with interest and costs.

The defendants, Grimshaw Company and its bondsman, appeal.

They contend that the evidence was insufficient to support a finding of duress, business compulsion or economic coercion

and that the court erred in denying their motion for instructed verdict made at the close of the evidence and in submitting the interrogatories to the jury.

The first interrogatory submitted to the jury reads as follows:

"Interrogatory No. 1. Was the plaintiff obligated under the contract to furnish the sills in controversy?"

(The jury answered, no).

The interrogatory was related to the issue framed by the allegations of the complaint to the effect that defendant requested plaintiff to furnish additional materials, not included in the sub-contract (the stools and sills) and agreed to pay for them and defendant's answer that the items were included in the original sub-contract and that subsequent to a correspondence about it, as to the construction of the sub-contract, "there was a complete accord" and plaintiff agreed to and did furnish the items according to his sub-contract and not as extras, and in accordance with the terms thereof, plaintiff from time to time requested progress payments under the sub-contract and included the said items therein and was paid therefor.

It is contended for appellant that there was no substantial evidence to support the negative answer of the jury and that the finding was contrary to the contract's plain import.

█ The contract being in writing did not present any factual controversy for jury determination but solely a question as to its proper construction and its legal effect upon the parties. That question was for the court to determine. Floyd v. Ring Construction Co., 8 Cir., 165 F.2d 125, 129, certiorari denied 334 U.S. 838, 68 S.Ct. 1496, 92 L.Ed. 1763; Pike Rapids Power Company v. Minneapolis, St. Paul & S. S. M. R. Co., 8 Cir., 99 F.2d 902, 916; National Surety Corp. of New York v. Ellison, 8 Cir., 88 F.2d 399, 402. We find the law of Arkansas to be in accord. See Lindner v. Mid-Continent Petroleum Corp., 221 Ark. 241, 252 S.W.2d 631, 632; Paepcke-Leicht Lumber Co. v. Talley, 106 Ark. 400, 153

S.W. 833; Triska v. Savage, 219 Ark. 80, 239 S.W.2d 1018. We hold, therefore, that it was error to submit this interrogatory to the jury as it was incumbent on the court below to construe the contract as a matter of law.

The true meaning of the contract herein involved can be arrived at through consideration of the language used, in the light of the situation of the parties under the circumstances existing at the time, together with all fair inferences to be drawn from this situation and these circumstances. Indeed, this court held in National Pigments & Chemical Co. v. C. K. Williams & Co., 8 Cir., 94 F.2d 792, 795, that instruments "are not rendered ambiguous by the fact that the parties do not now agree upon the proper construction to be given them." The contract here was deliberately entered into, the language used is clear, and its meaning can easily be determined from a consideration of the simple and harmonious facts with which it deals.

The sub-contract between the parties stated, in pertinent part, as follows:

"Whereas, Contractor desires to sub-contract to the Sub-Contractor the furnishing of all materials, tools and equipment and the performing of all work and labor necessary for the completion of the following portion or subdivision of the work to be performed in accordance with said contract and the Plans and Specifications therefor, to-wit:

"For furnishing all plant, labor, equipment, appliances, and materials, and performing all operations in connection with the installation of Aluminum Windows, Aluminum Louvers, Aluminum Door Frames, in strict accordance with the specifications, Section M-1 through M-5, applicable drawings, Addenda No. 1, 2, 3, & 4, and subject to the terms of the contract."

The following paragraph of the sub-contract lists the items not included:

"*Not Included*—Furnishing and Erection of Steel Items: Angles,

Shims, Bolts, Louvers, Etc., Wood Items, Inserts, Anchors, Nailers, Etc., Glass, Glazing."

Section M-1 through M-5 of the specifications as referred to in the contract are, in pertinent part, as follows:

*"Section M"*

*"Aluminum Grid, Frames, Sash, Screens and Panels.*

"1. *Scope.* The work covered by this section of the specifications consists of furnishing all plant, labor, equipment, appliances, and material and in performing all operations in connection with the installation of aluminum windows, complete, in strict accordance with this section of the specifications and the applicable drawings, and subject to the terms and conditions of the Contract.

"2. *General.* All metal windows, and equipment, shall be the product of a recognized manufacturer * * * The windows shall be furnished and erected complete, with insect screens * * * and with all necessary attachments, operators, hardware, and other accessories necessary and required for complete installation. * * * Each window shall be securely and permanently anchored in place to the building construction, * * * The entire installation shall be made weathertight and watertight and the Contractor and the manufacturer of windows shall assume full responsibility for this requirement * * *.

"3. *Caulking and Grouting.* * * * grouting, or filling and caulking, shall be applied to all joints between frames or exterior molds and the adjacent construction in such manner as to render the equipment weathertight, wind and moisture-proof at these joints.

\* \* \* \* \* \*

"5. Material * * *

"(b) Interior stools where required, shall be not less than ⁹⁄₂₃″ thick, extruded aluminum of one (1) piece without joints * * *.

"Exterior sub-sills where required, shall be not less than ⅛″ thick extruded aluminum * * *."

Nevil C. Withrow testified that he had been in the window specialty business over twenty years and that "specifications are so familiar to me, I don't believe that I can describe them technically." We cannot believe that a person so experienced in the window construction specialty and dealing with window specifications under sub-contracts for the length of time Withrow has devoted to it, could, after a careful study of the specifications and architect's drawings herein, arrive at the conclusion that the installation of the windows did not include the stools and sills, when the drawings clearly show them and the wording of the specifications plainly made it impossible to install the windows "complete * * * permanently anchored in place * * * weathertight, watertight * * * caulked and grouted * * * Interior stools where required not less than ⁹⁄₂₂″ thick, interior sub-sills where required not less than ⅛″ thick * * * and contain all necessary attachments, operators, hardware and other accessories necessary and in strict accordance with the applicable drawings, Section M-1 through M-5 of the specifications," without installing the window stools and sills.

Interrogatory No. 2 submitted to the jury was as follows:

"Interrogatory No. 2. Was the plaintiff under duress when he furnished the sills in controversy?"

(The jury answered, yes).

This Court has consistently held that when the alleged facts, pleaded as constituting duress, are denied, the question of whether they existed is a question for the jury and whether those alleged facts, if they did exist, were sufficient to constitute duress, is a question of law. Bennett v. Mahon, 8 Cir., 180 F.2d 224, 227; Furman v. Gulf Insurance Company, 8 Cir., 152 F.2d 891, 894; Winget v. Rockwood, 8 Cir., 69 F.2d 326, 330; Meyer v. Guardian Trust Company, 8 Cir., 296 F. 789, 35 A.L.R. 856; Dick v.

Marx & Rawolle, 55 App.D.C. 267, 4 F.2d 879; Cf., Bene v. New York Life Insurance Co., 191 Ark. 714, 87 S.W.2d 979.

We find the same rule applied by the Supreme Court of Arkansas in National Life & Accident Insurance Co. v. Blanton, 192 Ark. 1165, 97 S.W.2d 77, 79–80, wherein that court considered the question of duress in the method of procuring a signed release and the testimony was in irreconcilable conflict. The court held since the jury found that the facts, alleged to constitute the duress, did exist, these facts were sufficient to constitute duress.

■ The facts in the present case alleged to constitute duress and economic coercion are not in dispute and whether such facts, as they existed, were sufficient to constitute duress was a question of law and the court was in error in submitting the second interrogatory to the jury. The evidence introduced to show Grimshaw's threats is contained in the correspondence between the parties at the time of the dispute and may be summarized as follows:

1. By letter of April 20, 1953, Grimshaw stated:

"Unless we have the desired cooperation from you, it will be necessary for us to have this work accomplished by someone else and the final cost of materials and installation will be charged to your contract."

2. By letter of April 29, 1953, in which Grimshaw said:

"In view of the * * * facts, our position has not changed and we again request the required subsills be furnished and installed in accordance with your proposals and subsequent contract. In the event you decide on the contrary you leave us no other alternative except to purchase this material elsewhere, have it installed and charged to your contract."

3. On June 11, 1953, when Withrow's shop drawings still indicated he did not intend to furnish the subsills or interior stools and Withrow had suggested a court action to construe the contract, Grimshaw wrote Withrow:

"We see no point in going to court at this time in view of the fact you have made no installation nor furnished any materials under the existing contract, and we would prefer to cancel the contract completely rather than invite court action as a result of an apparent misunderstanding at this time. If agreeable to all concerned, we prefer to handle this problem in that manner.

"On the other hand, if you insist on furnishing only a part of the materials under your contract with us, we will be forced to contract elsewhere, for the items you do not furnish and charge the cost, plus the installation, to your contract. In this event it will be your privilege to file suit in an effort to recover such back charges when they have actually occurred.

"On the basis of your letter, dated June 8, we are proceeding with our effort to purchase elsewhere the materials in question and will arrange for the installation. Since there is no time to be lost and we would like an expression from you immediately whether or not you prefer to go on with your contract in its entirety or if you desire that we shall cancel out. If you elect to furnish all the materials except the subsills and stools, these will be purchased and installed by us and charged back to your contract in accordance with our letter of April 29."

4. And finally on July 1, 1953, Grimshaw wrote:

"In connection with your letter of June 23, regarding the items of exterior sills and interior subsills, we cannot entertain a proposal from you covering these items which represents an addition to your contract. Our position in this regard has been clearly stated, and is of record in your files. We are proceeding with the purchase of these items, and un-

less we have advice from you within five days that you will comply with all provisions of your contract which includes the exterior subsills and interior sills, we will be forced to cancel your contract in its entirety."

On July 2, 1953, Nevil C. Withrow wrote the Grimshaw Company, stating:

"Nevil C. Withrow Company, Inc., is proceeding to include and furnish said exterior sills and interior sills (as shown on the architect's plan) which are in dispute and future shop drawings will be changed accordingly.

"Please delete from shop drawings in your possession note pertaining to exterior and interior sills so that resubmission will not be necessary."

In connection with the foregoing correspondence, Withrow testified on the trial: "My company is not a large company * * * gross annual profit is probably $18,000 or $20,000. It varies, of course, but on an average we have somewhere around $35,000 possibly to $60,000 gross. If this contract had been cancelled out I stood to lose the entire business. I mean go broke. The cancellation confronted me with bankruptcy * * * if the cancellation went through it meant the collapse of everything I built up * * * I felt that in furnishing them [the stools and sills] we would further the progress * * * I thought that after we got things all down the line and worked out they would pay for them. If they owed for them I expected pay for them * * *."

Under the evidence here the only acts threatened by Grimshaw Company were those provided by the contract as remedies in case of default. No unlawful acts were threatened by Grimshaw and Withrow testified: "There were three possibilities under the correspondence * * * I could proceed to furnish the material under the contract and not charge him anything for it as in his letter of July 6, or I could say I won't do any of it and he would cancel the contract, or I could furnish everything under the contract except the aluminum sills and he would buy the material elsewhere and backcharge it * * * At that time, and except for my own business necessities, theoretically, I had a choice of any one of these possibilities * * * I elected to take the choice to furnish the material, not charge him with anything for extras, and hope that when the whole job was over, under negotiation I would then get some compensation for it."

■ An examination of the cases in the field of duress and economic coercion makes it clear that three elements are common to all situations where actionable duress has been determined to exist: (1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party. United States v. Bethlehem Steel Corp., 315 U.S. 289, 301, 62 S.Ct. 581, 86 L.Ed. 855, and cf., Furman v. Gulf Insurance Company, 8 Cir., supra; Bennett v. Mahon, 8 Cir., supra; Winget v. Rockwood, 8 Cir., supra.

■ In order to substantiate the allegation of economic duress or business compulsion, the plaintiff must go beyond the mere showing of a reluctance to accept and of financial embarrassment. There must be a showing of acts on the part of the defendant which produced these two factors. The assertion of duress must be proven by evidence that the duress resulted from defendant's wrongful and oppressive conduct and not by plaintiff's necessities.

■ In reviewing the testimony presented as evidence of the alleged duress herein, we do not find wrongful conduct on the part of Grimshaw nor that Grimshaw's statements that he would resort to his legal remedies under the contract deprived Withrow of the exercise of his free will or volition. Withrow, by his own testimony, voluntarily agreed to proceed and furnish the windows, when as he testified, he had three alternatives including a complete and adequate remedy at law if Grimshaw was wrong about the contract. Withrow, however, chose

to furnish the sills under the contract and not as extras, and so stated in his letter of July 2, 1952. Grimshaw gave his written acceptance of this offer on July 6, 1955, and this agreement to furnish the sills under the contract and not as extras constitutes a bar to the relief demanded by plaintiff.

 Withrow contended that the Ware Laboratories might impose a cancellation charge if Grimshaw cancelled the contract, and that because of his financial condition, this might bankrupt him. But the contention seems to be without merit, in that the alleged danger of a cancellation charge by a third party cannot be made the basis of a claim of duress between contracting parties. Further, in the record of this case we find no evidence that Ware Laboratories threatened a cancellation charge or that Grimshaw had anything to do with plaintiff's financial condition and whatever may have been Withrow's financial need, no threats by Grimshaw to cancel the contract produced this condition. Nothing in this record suggests that the defendant did not act in good faith nor does the evidence show that Grimshaw took advantage of Withrow's financial condition, or in fact, that he had any knowledge of it. In these circumstances, Withrow's own financial condition, for which Grimshaw was in no way responsible, could not be made the basis of a claim of duress. Silliman v. U. S., 101 U.S. 465, 471, 25 L.Ed. 987; Lawrence v. Muter Company, 7 Cir., 171 F.2d 380, 382.

 On consideration of the whole record, our conclusion is that no facts were present, sufficient, to support a finding of duress practiced upon Withrow in the making of his agreement to furnish the sills under his contract, and not as extras, and that his agreement made subsequently to the original subcontract considered with his request for and receipt of payment for the items under the contract, constitutes a complete bar to the relief demanded by him.

The motion for directed verdict should have been sustained. The judgment appealed from is reversed and the cause is remanded with directions to enter judgment for defendant.

Reversed and remanded.