Pat BELL and Hazel Bell, Appellants,

v.

UNITED STATES of America, Appellee.

No. 9106.

United States Court of Appeals Tenth Circuit.

June 30, 1967.

Rehearing Denied Aug. 17, 1967.

Robert J. Woolsey, of Farmer, Woolsey, Flippo & Bailey, Tulsa, Okl., for appellants.

Sam E. Taylor, Asst. U. S. Atty. (Lawrence A. McSoud, U. S. Atty., on the brief), for appellee.

Before LEWIS, BREITENSTEIN and HILL, Circuit Judges.

HILL, Circuit Judge.

This civil action was brought by the United States for a money judgment on four separate promissory notes given by the appellants to the Farmers Home Administration in consideration of that agency's loaning appellants money pursuant to the Special Livestock Loan Act. The two notes that were executed first in point of time were signed by both appellants and the last two were signed by Pat Bell alone. The trial court entered judgment for the United States and against both appellants in the amount of the principal, $5,864.07, and accrued interest, $2,635.52, remaining unpaid on the first two notes and against Pat Bell alone in the amount of the principal, $2,757.35, and accrued interest, $1,259.75, remaining unpaid on the last two notes. The Bells appeal from that judgment.

The Special Livestock Loan statute, 67 Stat. 149(c) (1953), provided a method whereby money could be loaned by the United States to certain "established producers and feeders of cattle, sheep, and goats * * * who have a good record of operations, but are unable temporarily to get the credit they need from recognized lenders and have a reasonable chance of working out of their difficulties with supplementary financing." Such loans were to be made with the approval of special local committees appointed by the Secretary of Agriculture. The committees were also directed to perform "such additional functions under this Act * * * including general direction of the servicing of the loans, as the Secretary may prescribe."

In September of 1955, by written application, appellants applied for a loan of $32,000.00. In that application appellants recognized a prior and outstanding loan made by the government to appellants, which was secured by 189 head of cattle then owned by them. The application states that the purpose of the $32,000.00 loan is to cover 1956 operations; that the loan "overlaps" a previous 1955 loan, which loan will be paid in full when the 189 calves are sold; that "practically all" operating expenses were included in the loan; that the plan should be flexible enough to meet changing conditions, such as weather and prices; that the loan was based upon land presently operated by appellants "with some purchased feed;" that at a later date an additional loan might be made to place a number of calves on wheat pasture on a grazing privilege basis; and that appellants planned to use $16,000.00 of the loan proceeds to purchase 250 head of cows.

The local county loan committee approved the loan and certified that appellants' note for $32,000.00 had been received and delivered to the Farmers Home Administration and that all other

pertinent requirements and regulations had been met.

The application was reviewed by personnel in the Oklahoma State Office of the Farmers Home Administration, who returned it to the County Supervisor. The State Office criticized several aspects of appellants' plan and recommended that the local committee give further consideration to the application. The local committee proceeded to process the loan through the National Finance Office. From the proceeds of the $32,-000.00 loan, $21,548.89 was used to purchase 397 head of steers and heifers. Sixty-four head of these cattle were sold immediately and the money from that sale was placed in a bank and used for operating expenses. A portion of the loan funds was used to pay a local feed dealer and the feed purchased was, with the knowledge and approval of the local committee, being used to full-feed approximately 80 of the 189 head of cattle appellants had originally owned. In February of 1956, the State Office of the Farmers Home Administration learned that appellants had received the loan and that they were using part of the money to full-feed some of their cattle. Representatives of the Farmers Home Administration at the state level thereupon advised the local committee that this method of feeding was violative of applicable federal regulations and the dealer from whom appellants had been getting their feed was informed that the government would not be responsible for any feed purchased by appellants on credit after February 21, 1956.

In the summer of 1956, appellants applied for and secured a new loan for $5,-750.00 and both appellants executed the second promissory note to the government in that amount. This money was to be used by appellants to lease pasture upon which to graze their cattle. Subsequently, a portion of the leased premises burned and appellant Pat Bell thereafter, in August and September, 1956, applied for and received two additional loans from the government of $2,000.00 and $1,000.00, respectively, giving his promissory notes therefor. In October, 1956, appellants sold their cattle and applied the proceeds of the sale to their indebtedness to the appellee. This action was brought May 28, 1964, to recover the balance remaining unpaid on the notes. Appellants have admitted the execution and delivery of the notes.

Appellants have three contentions on appeal. The first concerns the amount of the judgment entered against them. Appellants stipulated in the trial court that there remained unpaid on the notes signed by both of them a balance of $5,864.07 and on the notes signed by Pat Bell alone $2,757.35 and the court entered judgment accordingly. Appellants now contend the stipulation is ambiguous, that they inadvertently or mistakenly entered into it and that it is inconsistent on its face. The stipulation states that there is an unpaid balance on the notes as reflected in exhibit "K", a certified statement of account. Exhibit "K" lists each of the four loans, the amounts advanced by the government, the amount of repayment made by the Bells and the unpaid balance. The total amount advanced by these four loans, plus interest, is $42,-512.25. The certification reflects that the Bells have repaid $40,758.20. Thus, appellants contend, the judgment is excessive.

In this connection, the government points out that the Bells had, before the $32,000.00 loan, received earlier loans from the government and had given notes therefor. In the applications for both the $32,000.00 and the $5,750.00 loans, the Bells acknowledge these prior notes. When the county committee prepared statements at the time Pat Bell received the last two loans, for $2,000.00 and $1,-000.00, the amounts due on the prior notes were included in the total balance due; and in the statement prepared at the time Pat Bell received the $2,000.00 loan, the committee indicated that the amount due on those earlier notes was $8,982.23, plus interest. The earlier notes were accordingly paid from the proceeds of the sale of appellants' cattle. This is a complete answer to their attack

on their stipulation and the amount of the judgment entered below.

Appellants next contend that the local committee had proper authority to permit appellants to use loan proceeds to full-feed some of their cattle and that the Farmers Home Administration wrongfully advised the committee that it had no such authority. The Special Livestock Loan Act, 67 Stat. 149(c) (1953), provides that loans shall be made subject to the approval of the local special committee and also that "The loans shall bear interest at the rate of 5 per centum per annum and shall be made on such other terms and conditions as the Secretary shall prescribe." In 6 C.F.R. § 384.2a the Administrator of the Farmers Home Administration, acting for the Secretary, issued a regulation which established certain "terms and conditions" upon which the loans would be granted.[1]

Appellants argue that this regulation permitted them to full-feed any of the 189 head they owned before the $32,000.00 loan was obtained; that the local committee was correct in permitting them to use loan funds to full-feed 80 of the 189 head; that the operation was properly being carried out according to the local committee-approved plan; that the feeding was necessary either through continued credit at the local grain dealers or additional loans; and, that the Farmers Home Administration wrong-fully overruled the county committee and "wrecked" their plan.

We think the Farmers Home Administration acted properly in advising the local committee that appellants could not use loan funds to full-feed their cattle. The regulation expressly provides that "loans may be made to finance feeding operations, other than commercial feed lot operations, in those cases in which otherwise eligible applicants are able to provide with their own resources the land necessary for providing adequate grazing and who produce substantially all of the feed required to carry the feeders to the finishing stage. * * * In such cases, the special livestock loan would provide only the funds required to purchase feeders and for operating expenses other than to pay rent or to make substantial feed purchases to carry the feeders to the finishing stage." The regulation further provides that "Such loans may include funds for the finishing process of feeding out cattle in lots only in connection with feeders carried by the applicant during the preceding grazing season and then only when it has been the applicant's practice to finish out his feeders for the market." We think this regulation does prohibit loan funds being used to full-feed cattle, even those cattle "carried by the applicant during the preceding grazing season."

---

1. "§ 384.2a *Eligibility requirements for feeders of livestock.* The primary purpose of the special livestock loan program is to assist established livestock operators to maintain their productive livestock herds. Special livestock loans will be restricted to livestock producers, including those who may run a limited number of purchased feeders each year. Loans will not be made to finance strictly feeding operations. However, loans may be made to finance feeding operations, other than commercial feed lot operations, in those cases in which otherwise eligible applicants are able to provide with their own resources the land necessary for providing adequate grazing and who produce substantially all of the feed required to carry the feeders to the fin-ishing stage. In addition, because of the speculative nature of feeding operations, the planned operations must show an estimated net income which would make them sound for the borrower and safe for the Government. In such cases, the special livestock loan would provide only the funds required to purchase feeders and for operating expenses other than to pay rent or to make substantial feed purchases to carry the feeders to the finishing stage. Such loans may include funds for the finishing process of feeding out cattle in lots only in connection with feeders carried by the applicant during the preceding grazing season and then only when it had been the applicant's practice to finish out his feeders for the market."

686

In addition, the government points out that the plan set out in appellants' application for the $32,000.00 loan does not mention full-feeding any cattle; however, $8,309.00 of the loan was set aside for feed, and this sum had been spent by appellants—$5,283.79 for feed and $3,025.32 for additional cattle—before the local committee was advised of 6 C.F.R. § 384.2a. We think the trial judge was correct when he said of appellants: "Their precarious situation and financial embarrassment were not the results of any coercive acts of the Government, but the result of their own actions in buying more cattle than their land and resources would support."

 When appellants applied for the second loan (of $5,750.00) they set out in their application that the repayment date was September, 1956, and that they would at that time sell all their cattle. The $32,000.00 loan was due to be repaid December 31, 1956. Appellants now contend that the Farmers Home Administration forced them to accelerate the date of sale of the cattle and that this accelerated date was contrary to the judgment of the local committee. This argument avails appellants nothing. They were not compelled to apply for a second loan. We have already pointed out that the government did not wrongfully force appellants into applying for the second loan by "wrecking" their plan.

■ The final contention is that the last three notes were executed under such circumstances of business necessity or compulsion as will render the notes involuntary and excuse appellants from being liable on them. Appellants say that the county committee approved a plan whereby they could full-feed their cattle, then the state office of the Farmers Home Administration indicated that the loan funds could not be so used, thereby compelling appellants to apply for the last three loans to obtain money for feed. There was no economic duress.

The government did only what it legally was required to do. No wrongful pressure was applied to appellants. As the Eighth Circuit said in a case in which the plaintiff was asserting economic duress, "The assertion of duress must be proven by evidence that the duress resulted from defendant's wrongful and oppressive conduct and not by plaintiff's necessities." [2]

Affirmed.

2. W. R. Grimshaw Company v. Nevil C. Withrow Company, 8 Cir., 248 F.2d 896, 904, cert. denied, 356 U.S. 912, 78 S.Ct. 669, 2 L.Ed.2d 585; See also Kohen v. H. S. Crocker Co., 5 Cir., 260 F.2d 790.